**Marcelos Ramos MOTTA and Society Ordo Templi Orientis, Plaintiffs,**

v.

**SAMUEL WEISER, INC., Defendant.**

**Civ. No. 81–0459–P.**

United States District Court,
D. Maine.

Dec. 6, 1984.

Robert E. Mittel, Michael P. Asen, Mittel & Hefferan, Portland, Me., for plaintiffs.

James S. Erwin, James R. Erwin, II, Strater, Hancock & Erwin, York, Me., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND OPINION

GENE CARTER, District Judge.

### I. *Introduction*

This is an action for copyright and trademark infringement. The center of this controversy is the literary legacy of Aleister Crowley, an English citizen who died in 1947. Crowley was the dominant figure in the Ordo Templi Orientis (OTO), a quasi-Masonic secret fraternity that was founded near the beginning of the twentieth century in Germany. Crowley wrote prolifically during his lifetime, and some of these writings have been published by the defendant in this case. Upon his death, Crowley devised his literary remains to the Ordo Templi Orientis.

Plaintiffs claim ownership of the Crowley copyrights and allege that these copyrights were infringed by Defendant. Plaintiff Motta is Supervisor General of the Society Ordo Templi Orientis (SOTO), a Tennessee corporation that was organized by him in 1978. Plaintiffs allege that the SOTO is legally cognizable as the successor to the OTO to which Crowley willed the rights to his literary remains. Motta alleges that he is the successor to Karl Germer, Crowley's successor, as "Outer Head of the Order" (OHO), or leader, of the OTO.

The action was tried to the Court in a trial that lasted five days. A full tran-

script of the testimony was prepared, and the parties have submitted post-trial briefs and proposed findings of fact and conclusions of law. The Court has concluded that Plaintiffs have failed to sustain their burden of proving that they own the Crowley copyrights in their individual capacities or, alternatively, that they may derive ownership from the OTO. Therefore, their claim of copyright infringement must fail.

In making the following findings of fact, the Court found it unnecessary to attempt to penetrate the mystical nature and occult practices of the OTO. It is sufficient to observe that OTO initiates aspire to pass through a series of mystical grades by taking part in secret rituals. The parties agree that the supreme authority within the organization is the Outer Head of the Order, and that Crowley occupied this position until he died. The prose, poetry and rituals authored by Crowley form the literary nucleus of the belief system of OTO devotees, and they have proven to have substantial value on the occult book market.

## II. *Findings of Fact*

The parties agree that the highest position of authority in the OTO, as conceived of and practiced by Aleister Crowley, is the Outer Head of the Order, or OHO. The parties agree that Crowley was the OHO of the OTO by self-designation until he died in 1947. Crowley left a will in which he devised "all the copyrights in my books and writings whatsoever and wheresoever including any copyrights over which at the date of my death I may have power of disposition to the Ordo Templi Orientis." Plaintiff's Exhibit 12(a). Neither party contests the validity or legal effect of the will, which was probated in England in 1949. *Id.*

Plaintiffs contend and Defendant does not contest that Karl Germer succeeded Crowley as OHO of the OTO. Germer was a resident of New York City at the time he acceded to the position of OHO and later moved to California. Germer obtained custody of Crowley's extant literary remains, and was involved in publishing several of Crowley's writings. Germer died in California in 1962. At the time of his death, he had not expressly named a successor as OHO of the OTO.

Plaintiff Motta, who spent his childhood in Brazil and speaks Portuguese as his native language, currently has a visa to reside in the United States. Tr. at 24, 25. Motta was initiated into the OTO by Germer in California in 1955 or 1956. Tr. at 39–40. Motta corresponded with Germer, often regarding OTO matters, regularly until Germer's death. Motta also visited with Germer at least three times. Motta testified that he spent a number of years in Brazil working on behalf of the OTO and another organization by the name of the "A.A.," described by Motta as "an occult order for mystical occult training." Tr. at 97; *see also* Tr. at 209–211.

Plaintiffs introduced a number of exhibits which they claim prove that Motta is Germer's successor as OHO of the OTO. In 1956 Germer wrote to Motta in Brazil indicating, "I am willing to give you a document *as my representative* for a limited time, but I would have to prepare you for it!" Plaintiffs' Exhibit 7 (emphasis added). This statement cannot constitute direct evidence supporting Motta's allegation that Germer appointed him OHO. First, Germer intended only to appoint Motta his *representative*, not his successor as OHO. Second, the context of the statement indicates that Motta's authority was to be limited to Brazil. Third, the representation was to be granted only for a limited time. Finally, the representation was conditioned upon Germer's preparing Motta for it, and it was not proven that any such document was ever given by Germer to Motta.

In 1962 Germer wrote to Motta regarding a collection of "Crowleiana":

> Please study this matter carefully and let me soon know if you are interested in buying the collection. Some years ago I suggested to Estelle to sell to the Sidney Library, from the consideration that that [sic] Australia is far enough distant from the political turmoil to assume that these valuable Crowleiana might survive a hol-

ocaust. South America also applies. Needless to say that I would like nothing better than this stuff to be in your hands, provided you can keep its possession secret and safe.

Plaintiffs' Exhibit 13. In 1961, Germer wrote to Motta:

I can see that you have been tentatively admitted into what I may call the thelemic chain; it will take long, patient, persistent work to prove yourself. In any case: YOUR WORK AT THIS PHASE is in BRAZIL, and nowhere else. It is demanded that you learn to stand on your own feet with courage and with confidence. It is very possible, even probable, that the call is for you to prepapre [sic] the ground for the establishment of a H.Q. somewhere there where ultimately—before "Armageddon"—the archives can be moved. This may be a year or more off.

Plaintiffs' Exhibit 14. No inference that Germer designated Motta his successor may be drawn from these statements. They indicate only that Germer tentatively perceived Motta to be a desirable *purchaser* of the Crowley collection because of Motta's residence in South America, "distant from the political turmoil." Moreover, the evidence indicates that Germer never effectuated his speculations.

Plaintiff Motta relies upon the preceding references as evidence that he is Germer's successor. He relies most heavily, however, upon a letter written to him five days after Germer's death by Germer's widow. Mrs. Germer stated in pertinent part:

Our beloved Master is Dead

He succumbed Oct. 25, 8:55 P.M. under horrifying circumstances.

You are The Follower

Please take it from me, as he died in my Arms *and it was his last Wish! Who the Heir of the Library is, I do not know up to now.*

Plaintiffs' Exhibit 16(b) (emphasis in last sentence added). On January 26, 1963, Mrs. Germer wrote to Motta:

But forget about me, You are Young, You are the Future of the Work, I did not believe when Karl said: It takes another 10 Years to Make Motta the Heir! But *Spiritually* you are his Heir! you have to work· on in Brazil, if You are stubborn You are not stubborn to me, You fight the Work!

Plaintiffs' Exhibit 19(b) (emphasis in original).

The "You are the Follower" statement does little to substantiate Motta's claim to be Germer's successor as OHO of the OTO. First, the evidence of record indicates that the word "follower" does not have any particular meaning in OTO parlance.[1] Motta now interprets Mrs. Germer's statement to mean that he is OHO, but there is no evidence that he ever so interpreted it prior to this trial. Second, whatever the statement might mean, the Court can accord it very little weight. It is second generation hearsay, admitted as the dying declaration of Germer, *see* Fed.R.Evid. 804(b)(2), and the excited utterance of Mrs. Germer. *See* Rule 803(2). Third, Mrs. Germer expressly stated that she did not know who the heir to the library was. Moreover, the diary entries of Mrs. Germer written prior to and at the time of her husband's death and other evidence demonstrate that her perception of reality at that time had deteriorated, and her credibility is subject to profound question.

---

**1.** Plaintiffs argue to the contrary in their reply brief:

Both of defendant's witnesses who supported that proposition [that "the follower" has no meaning in OTO parlance] were probably not aware of Verse 76, Book 2 of THE BOOK OF THE LAW which reads as follows:

What meaneth this, o prophet? Thou knowest not; nor shalt thou know ever. There cometh one *to follow* thee: he shall expound it. But remember, o chosen one, to be me; *to*

*follow* the love of Nu in the star-lit heaven; to look forth upon men, to tell them this glad word.

(Emphasis added.) This passage was not introduced as substantive evidence at trial and has not been so admitted by this Court. Even if the Court were to consider it, the passage does not support Plaintiffs' argument that "the follower" has the special meaning which Plaintiffs attempt to ascribe to it.

Under direct examination, when asked what position he holds in the OTO, Motta stated: "I am afraid that I must say that I am the Outer Head." Tr. at 119. On cross-examination, Motta said, "I regret to have to repeat that I am now the Outer Head of the order." Tr. at 133. Motta alleged at trial that he became the Outer Head upon Germer's death in 1962, and he bases his claim upon Mrs. Germer's statement, "You are the Follower." Tr. at 134. Some circumstantial support for Motta's claim is provided by evidence, summarized above, indicating that he corresponded frequently with Germer and that he had a serious commitment to studying, editing, and publishing the works of Aleister Crowley.

On the other hand, substantial evidence was introduced which tends to belie Motta's claim of status within the OTO. Although Motta claimed at trial to have assumed the position of OHO upon Germer's death in 1962, he stated a number of times subsequent to Germer's death to several different people that he was not the OHO. Tr. at 134, 135, 147; Defendant's Exhibits 18, 52. Motta stated at least twice that he was not eligible to be OHO, Defendant's Exhibits 52, 18, and at least twice that it was necessary to elect a new OHO to succeed Germer. Defendant's Exhibit 18.

Although Motta's interest in the writings of Crowley is not to be doubted, his professed interest in the OTO as an organization is not supported by the record. He stated at least twice that he was never very interested in the OTO. Defendant's Exhibit 52, and Tr. at 192. He stated several times that he preferred the A.A., *see supra* at 4, to the OTO. Defendant's Exhibits 71 (1957), 72 (1961), 60 (1971), 52 (1974).

Also, the Court is not persuaded of Plaintiff Motta's credibility on the central question regarding his status in the OTO, and, therefore, can accord very little weight to his testimony. His testimony and correspondence are rife with contradictions. The contradictory statements about his claim to be OHO and his interest in the OTO are cited above. Examples of Motta's peculiar attitude toward the truth abound in his testimony:

[by Mr. Erwin]

Q  And that's a letter you wrote to Mr. Grant in 1971?

A  Yes, sir.

Q  Do you recall telling him: "I am not concerned with the OTO as such"?

A  Yes, sir.

Q  Was that true at the time?

A  Yes and no.

Q  Well, did you mean it?

A  It was an attitude that I assumed.

Q  Well, either you meant it or you didn't mean it, Mr. Motta?

A  I did not mean it.

Tr. at 166–67.

Motta explained his inconsistency about his claim to be OHO as follows:

> Sir, I have been answering your questions and apparently I have not been calling myself a liar here. I am not interested in power or titles and I am much more interested in seeing the OTO on its feet working harmoniously together constructively than to be called the Outer Head of the OTO. I have avoided calling myself the Outer Head of the OTO because I know lots of people aspire to that title and if one of them could have shown to me that he or she is in a position right now to assume it, I would gladly let them have it. So that's why I have avoided using the words Outer Head of the order in relationship to myself, but because I truly would rather be doing something else, but I have promises to keep and miles to go before I sleep.

Tr. at 169. The Court rejects this explanation because it was not proven that Motta laid claim to the title at any time between Germer's death in 1962 and the commencement of this lawsuit. Furthermore, Motta advances no objective criteria by which his assertion that no one else is eligible to be OHO may be evaluated. Rather, his claim is based solely on his own subjective, self-serving assertions.

Plaintiffs' explanation in their post-trial brief for the numerous contradictions in Motta's testimony and correspondence is that "basic doctrine of the OTO requires people in leadership positions to dissemble about those subjects." Reply Brief of Plaintiffs at 6. First, it is strange that Plaintiff Motta, who was repeatedly confronted with these contradictions upon cross-examination and given the opportunity to explain them on redirect, did not offer this as an explanation at trial. Second, and more importantly, it makes little difference to the Court whether Motta's dissembling has a doctrinal basis or is simply the product of a dishonest mentality. In either case, the Court can assign very little weight to the testimony of an admitted dissembler.

Testimonial and documentary evidence reveals that Motta is not the only claimant to Crowley's literary legacy. Grady McMurtry is a California resident who met Crowley when he was serving in Europe at the conclusion of World War II. The evidence includes several letters from Crowley to McMurtry indicating Crowley's belief that McMurtry was a possible successor to Germer. Defendant's Exhibits 44, 45, 63, 64. Germer himself recognized that McMurtry held a preeminent historical status in the OTO several times during the 1940s and the 1950s. *See* Defendant's Exhibits 66, 67, 68, 69.

At some point prior to Germer's death, McMurtry and Germer had a falling out. McMurtry left California in 1961 and went to Washington, D.C. to work for the Federal Government. Tr. at 510. He returned to California in 1969. Tr. at 511. Upon his return, McMurtry found that the OTO organization "had disintegrated." Tr. at 513. McMurtry does not claim to be OHO, but he is the *de facto* leader of a group of California devotees of Crowley who consider themselves the legitimate OTO. McMurtry's organization is incorporated in California. Tr. at 508.

James Wasserman, a member of the California incarnation of the OTO, testified that the California-based organization has "approximately 750 members in active standing worldwide." Tr. at 245. Wasserman was a former associate of Plaintiff Motta and at one time had a power of attorney from Motta to act on his behalf in order to obtain access to the Crowley library. Tr. at 216. Wasserman was also at one time an employee of Defendant Samuel Weiser, Inc. Tr. at 217. While in California in 1976 representing Motta and Defendant, Wasserman was initiated into the OTO by McMurtry. Tr. at 236. Wasserman testified that at that time Motta was not attempting to run any kind of OTO in the United States. Tr. at 235.

Motta incorporated his group as the Society Ordo Templi Orientis (SOTO) in Tennessee in 1978. Plaintiffs' Exhibit 35. He claims a total membership of five. Tr. at 214.

McMurtry entered into a contract to publish the "Thoth Tarot Cards" as "caliph" of the OTO in 1970. Defendant's Exhibit 47. In 1976 McMurtry obtained an order in the Superior Court of the State of California which stated that McMurtry was the "duly constituted and authorized representative of the Ordo Templi Orientis" and that he therefore had the right of possession of OTO literary materials that had been left by Karl Germer. Defendant's Exhibit 59. The evidence is conflicting about whether Plaintiff Motta received notice of the proceeding. It is unnecessary to resolve this factual issue; the Court accepts the Court Order only as circumstantial evidence of McMurtry's state of mind with respect to his status in the OTO.

The evidence demonstrates that there are still other possible claimants to the OTO legacy. These include a group in Switzerland led by a Joseph Metzger, Defendant's Exhibits 20, 50, a group in England led by a Kenneth Grant, Defendant's Exhibit 5, and a former associate of Crowley by the name of Frederick Mellinger. Plaintiffs' Exhibits 75, 76. The Court need not decide whose claim is superior. The Court simply finds as a fact that Plaintiffs represent only one of several groups who claim to be

legitimate successors to Aleister Crowley's original OTO.

There is no evidence indicating that the OTO was ever incorporated during the lifetime of either Crowley or Germer. Crowley's will left his literary remains to the "Ordo Templi Orientis." He named two literary executors; Louis Umfraville Wilkinson and John Symonds, both English citizens. Their role, potentially significant, in the disposition of the copyrights is not addressed by either party. Crowley's will contains no statement concerning the membership or geographical distribution of the Ordo Templi Orientis to which he devised his copyrights. The evidence presented does not include any externally verifiable criteria for membership in the OTO or for devolution of the title of OHO at the time Crowley died, at the time Germer died, or today. The Court accordingly finds that the membership of the OTO is indefinite and cannot be ascertained. The Court also finds that Plaintiff Motta has failed to prove that Karl Germer ever appointed him successor as OHO.

### III. Conclusions of Law

Plaintiff Motta and SOTO do not own the Crowley copyrights in their individual capacities.

■ The OTO is not proven to be an unincorporated association having legal status to own property. Therefore, Plaintiffs cannot derive ownership of the copyrights from the OTO.

### IV. Pending Motions

One pretrial motion and five post-trial motions remain to be decided in this case.

Defendant moved to amend its answer on February 27, 1984, two days before trial began. Defendant sought to add ten "affirmative defenses" to its answer. The Court permitted the amendments on the condition that:

Plaintiff is not precluded from arguing in respect to any affirmative defense pleaded therein that such defense has been waived under the Federal Rules of Civil

Procedure, Rule 12(b) and (h), or by other operative principle of law by failure to previously plead such defense as required by those rules of law.

Tr. at 12. Because the Court has determined that the issue of ownership, on which Plaintiffs have the burden of proof, is dispositive in this case, it is unnecessary for the Court to reach the question whether Defendant's Answer should be amended to include "true" affirmative defenses.

■ Plaintiffs have filed four post-trial motions concerning registration of various copyrights with the United States Copyright Office: a Motion to Amend Complaint, filed July 3, 1984; a Motion to Amend Record, filed July 20, 1984; a Motion to Amend Record, filed July 26, 1984; and a Motion to Amend Record, filed September 17, 1984. Because the Court has determined that Plaintiffs have failed to sustain their burden of proving ownership, the issues posed by these motions respecting registration of specific copyrights are moot and need not be reached by the Court.

Plaintiffs have also moved to amend the record, on September 20, 1984, to introduce three documents, alleged to be a letter from Germer to Motta, a letter from McMurtry to Germer, and a letter from Germer to McMurtry. Defendant objected on the stated grounds, *inter alia,* that the documents have not been authenticated and no foundation for their admissibility has been provided. Defendant's objection is well-founded, and, accordingly, the Motion to Amend Record shall be denied. The Court notes that it has reviewed the proffered documents and that, even if they were to be admitted, they would not alter the findings contained in this decision.

### V. Opinion [2]

#### A.

Plaintiff Motta does not claim personal ownership of the Crowley copyrights. Rather, he contends that his ownership rights are derived from his capacity as OHO or member of the OTO. Plaintiffs' Brief at 8–10.

---

**2.** This case would present difficult questions as to choice of law with respect to the issue of ownership were there any conflict in the law of the interested jurisdictions. First, there is the issue of whether state or federal law applies to the issue of ownership. There is authority sup-

Plaintiffs contend, however, that Plaintiff SOTO is the owner of the Crowley copyrights. Plaintiffs' Brief at 10. SOTO was incorporated by Motta in Tennessee in 1978; Motta claims a nationwide membership of five individuals. The Court has found that other persons with viable claims to OTO membership are not members of Plaintiff SOTO. Any claim by Plaintiff SOTO that it is the exclusive successor to the associational name, "OTO," must, on this record, fail. At best, Plaintiff SOTO is shown to be merely a corporate member of the organization known as the OTO. Plaintiff SOTO's ability to assert in a legal forum a claim of ownership of the Crowley copyrights, therefore, must be derived from its capacity as an OTO member.

In summary, neither Plaintiff has proven direct ownership of the Crowley copyrights. Any rights they may have must be derived from their status within the OTO.

### B.

■ Plaintiffs have the burden of proving that they own the copyrights in an infringement action. *Knickerbocker Toy Co., Inc. v. Azrak-Hamway International, Inc.*, 668 F.2d 699 (2d Cir.1982); *Walker v. University Books, Inc.*, 602 F.2d 859 (9th Cir.1979); *Ferguson v. National Broadcasting Company, Inc.*, 584 F.2d 111 (5th Cir.1978). If the OTO is not a legal entity capable of owning property, Plaintiffs cannot own the copyrights, and their infringement action must fail.

One of the fundamental precepts of Anglo-American jurisprudence is that a right, to be enforced in a court of law, must have a "holder" or "bearer." See IV R. Pound, *Jurisprudence* 192 (1959). There must be a "legal unit" to which the right attaches. *Id.* This may be a natural person or some other entity which has been accorded legal personality by common law or statute.

The concept of legal personality is to be distinguished from the concepts of standing and capacity. Standing focuses primarily upon the relationship between a person and a legal claim. *See* 13 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3531 (1984). Capacity, as normally used, connotes capacity to engage in legal transactions or to obtain judicial relief. Dean Pound explained:

> Capacity for rights must be distinguished from capacity for legal transactions (i.e., for acts intended to produce legal consequences to which the law, giving effect to the intention, attaches the intended consequence), capacity for wrongs (i.e. for acts involving civil liability for infringement of rights in rem), and capacity for crimes (i.e. for breaches of absolute duties for which the law provides penal consequences). Want or loss of legal personality, therefore, is quite another thing from lack or loss of capacity for legal transactions or for wrongs or for crimes or for all of them. A person may have legal rights (using rights in the broader sense) and yet be incapable of legal transactions, or incapable of incurring legal liability, or incapable of responsibility for what would otherwise be accounted crimes.

IV R. Pound, *Jurisprudence* 276–77.

The record in this case poses the fundamental question as to whether the OTO is a

porting the view that state law should apply to issues respecting ownership in actions brought under the federal Copyright Act. *See Bartsch v. Metro Goldwyn Mayer, Inc.*, 391 F.2d 150, 153 (2nd Cir.1968); *Fantastic Fakes, Inc. v. Pickwick International, Inc.*, 661 F.2d 479, 483 (5th Cir. 1981); *De Sylva v. Ballentine*, 351 U.S. 570, 76 S.Ct. 974, 100 L.Ed. 1415 (1956). Second, there is the question as to whether state or federal choice of law rules apply where jurisdiction is founded upon a federal question. *See Pennzoil v. Federal Energy Regulatory Commission*, 645 F.2d 360, 387 (5th Cir.1981) (federal choice of law rules apply); *compare Klaxon v. Stentor*

*Electric Manufacturing Co., Inc.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) (federal court sitting in *diversity* must apply choice of law rules of forum state). Finally, there is the question of which state's law should apply. Here, Maine, Tennessee and California are interested jurisdictions. The Court has reviewed the law of the various interested states and the federal "common law" and has determined that there is no conflict with respect to the fundamental principles that are decisive in this case. Accordingly, it is unnecessary to undertake an extended choice of law analysis.

person in the law. Under the common law, an unincorporated association is not recognized as a legal entity. *Moffat Tunnel League v. United States*, 289 U.S. 113, 118, 53 S.Ct. 543, 545, 77 L.Ed. 1069 (1933); *Johnson v. South Blue Hill Cemetery Association*, 221 A.2d 280 (Me.1966); *Byam v. Bickford*, 2 N.E. 687, 140 Mass. 31 (1885); *State v. Sunbeam Rebekah Lodge No. 180*, 127 P.2d 726, 169 Or. 253 (1942). Relief from this rule is available in two different ways. First, courts may determine that a right such as ownership which cannot vest in the association as an entity may vest in the individuals who comprise the organization. *See, e.g., County of Trinity v. Rourke*, 79 Cal.Rptr. 902, 275 C.A.2d 628 (1969); *Flanagan v. Benvie*, 273 P.2d 381, 58 N.M. 525 (1954); *Rhode Island Association for Blind v. Nugent*, 206 A.2d 527, 99 R.I. 187 (1965); *Byam v. Bickford*, 2 N.E. 687, 140 Mass. 31 (1885); *Johnson v. South Blue Hill Cemetery Association*, 221 A.2d 280 (Me.1966). Alternatively, some states have enacted statutes conferring entity status upon unincorporated associations for one or more purposes. *See, e.g.,* Cal.Corp.Code § 20001 (West 1977) (permits "any unincorporated society or association" to hold property); 14 M.R.S.A. § 2 (1980) (unincorporated association may sue in the name of its trustees).

It is elementary that a court may not recognize an association as a legal entity under a statute or, alternatively, determine that a right vests in the individual members of an association unless the association has a distinct, identifiable membership. *See Johnson v. South Blue Hill Cemetery Association*, 221 A.2d 280 (Me. 1966); *State v. Sunbeam Rebekah Lodge No. 180*, 127 P.2d 726, 169 Or. 253 (1942). An "association" that exists in name only is not an association at all, as the term is defined in both common and legal vernacular. Although the formalities of the corporate form are by definition absent, an unincorporated association must have certain characteristics which justify its recognition as an entity or as a distinct group of individuals.

The term "unincorporated association" has been defined as:

a voluntary group of persons, without a charter, formed by mutual consent for the purpose of promoting a common enterprise or prosecuting a common objective.

*Local 4076, United Steelworkers v. United Steelworkers, AFL–CIO*, 327 F.Supp. 1400, 1403 (W.D.Penn.1971). The term was elsewhere defined similarly as

[an] organization composed of a body of persons united without a charter for the prosecution of some common enterprise. *Meinhart v. Contresta*, 194 N.Y.S. 593, 594 (Sup.Ct.Spec.Term 1922).

*California Clippers, Inc. v. United States Soccer Football Association*, 314 F.Supp. 1057, 1068 (N.D.Cal.1970). The Supreme Court had occasion to expound upon the ordinary meaning of the term "association" as it is used in the law:

It has been defined as a term "used throughout the United States to signify a body of persons united without a charter, but upon the methods and forms used by incorporated bodies for the prosecution of some common enterprise." 1 Abb.Law Dict. 101 (1879); 1 Bouv.Law Dict. (Rawle's 3rd Rev.) 269; 3 Am. & Eng.Enc.Law (2d ed.) 162; and *Allen v. Stevens* (App.Div.) [33 App.Div. 485], 54 N.Y.S. 8, 23, in which this definition was cited with approval as being in accord with the common understanding. Other definitions are: "In the United States, as distinguished from a corporation, a body of persons organized, for the prosecution of some purpose, without a charter, but having the general form and mode of procedure of a corporation." Webst. New Internat. Dict. "[U.S.] An organized but unchartered body analogous to but distinguished from a corporation." Pract. Stand. Dict. And see *Malley v. Bowditch* (C.C.A.), 259 Fed. 809, 812; *Chicago Title Co. v. Smietanka* (D.C.) 275 Fed. 60: also *United Mine Workers v. Coronado Co.*, 259 U.S. 344, 392 [42 S.Ct. 570, 576, 66 L.Ed. 975], in which unincorporated labor unions were held to be "associations" within the meaning of the Anti-Trust Law.

*Hecht v. Malley,* 265 U.S. 144, 157, 44 S.Ct. 462, 467, 68 L.Ed. 949 (1923). *See also Penrod Drilling Company v. Johnson,* 414 F.2d 1217, 1222 (5th Cir.1969); *Health Care Equalization Committee of the Iowa Chiropractic Society v. Iowa Medical Society,* 501 F.Supp. 970, 976–77 (D.Iowa 1980).

■ These definitions make it clear that an unincorporated association is more than a name; the concept connotes a well-defined group of legal persons connected by a common purpose or interest. This common purpose or interest affords a court objective criteria by which it may ascertain the membership. Lacking such criteria, a court cannot grant requested relief to the members of an association. *See Johnson,* 221 A.2d at 283; *Sunbeam Rebekah Lodge,* 127 P.2d at 731. In *Johnson,* the Maine Supreme Judicial Court identified the obstacles to permitting a testamentary gift to vest in the members of a volunteer, unincorporated cemetery association:

> The actual membership of the Association at the time of the testatrix's death is uncertain and cannot be ascertained with any reasonable degree of accuracy. No by-law exists which regulates or defines eligibility for membership ... No criterion of membership being established, neither the purchase of a cemetery lot nor a donation to the Association without more was sufficient to characterize such action as an assent on the part of the purchaser or donor to become a member of the Association. Thus, in the instant case, *basic and necessary conditions upon which membership in the defendant Association could be predicated are wanting, and rights and liabilities as usually arise from membership in an unincorporated voluntary association cannot be left for their enforcement to such loose contacts as evidenced herein.* The membership in the South Blue Hill Cemetery Association was not sufficiently definite and determinate.

*Johnson,* 221 A.2d at 283 (emphasis added).

■ The Court has found that Plaintiff SOTO, a Tennessee corporation, is at best one of many actual or potential claimants to OTO membership. On the evidence before the Court it is not possible to identify a chain of successorship which enables the Court to recognize a definite organization which has the exclusive right to use of the OTO associational name. Crowley identified several possible successors to himself and Germer, and Motta was not one of them. The Court has found that Germer did not appoint Plaintiff Motta as his successor. When they discussed possible successors in their correspondence, both Crowley and Germer wrote in vague, noncommittal terms. They both often changed their opinions of their followers and sometimes about each other. Their judgments about OTO hopefuls with whom they corresponded were highly subjective and are not capable of translation by this Court into objective criteria by which the present-day membership of the OTO may be ascertained. Their correspondence, like most of the letters introduced in the case, is steeped in intrigue and recrimination. The evidence adduced at trial demonstrates that anyone who engaged in correspondence with Crowley and Germer regarding the OTO could not be prevented from starting his own group under the OTO banner.

The reality is that neither Crowley nor Germer articulated, prior to their deaths, anything resembling a set of objective criteria by which the Court can determine the repository of OTO authority or the limits of its membership. Crowley's legacy is not an organization of definite membership, but an amorphous set of ideas and rituals which may be appropriated by any Crowley or OTO aficionado. The record does not prove the evolution, subsequent to the deaths of Crowley and Germer, of any authoritative criteria to determine membership in any discrete group of persons known as the OTO. In short, the OTO is not a legal "person" capable of owning property as an entity or through its individual members.

Having failed to prove that Plaintiffs own the copyrights in their individual capacities, Plaintiff Motta is forced to resort to claiming ownership as a member of the

OTO. Plaintiff insists that the Court can award its "ultimate judgment" to the OTO and that it need not decide who are the true followers of Aleister Crowley. It is true that the Court need not choose among rival claimants, but the Court must determine that the OTO has legal personality in order to find that it is capable of ownership. Such a determination cannot be made on this record. The critical distinction is that to be made between a design for a fraternal fellowship that exists only in the abstract, on the one hand, and an actual assemblage of human beings associated for some unique or discernible purpose, on the other. The OTO is shown by this record to have been nothing more than an idea in the mind of Aleister Crowley which was embraced by that of Germer.

Even if the Court assumes (the evidence suggests otherwise) that Crowley was the leader of an identifiable association of persons who sought to execute his idea, that he expressly appointed Karl Germer to succeed him as leader, and that Germer also presided over an identifiable association of persons united by Crowley's fraternal idea, the record before the Court falls far short of proving that, at the present time, or at the time of the alleged infringements, any particular group of human beings could lay exclusive claim to be the OTO, as conceived of by Aleister Crowley when he devised his literary rights to the OTO. The abstract idea of an OTO persists, available to be appropriated by anyone so inclined, but no single group of persons having exclusive right to use of the OTO name appears from this record to exist.

Finally, the Court should take note of the fact that neither Plaintiffs nor Defendants expressly raise in a discrete context the issue as to whether the OTO is a cognizable legal entity. Ordinarily, when an issue is not raised, it is waived. In this case, however, there are at least two compelling reasons why the Court must deal with the issue *sua sponte.*

First, there is no question that the parties raised the issue of Plaintiffs' ownership of the copyrights as an element of a claim of infringement, and capacity for ownership is an essential predicate to such ownership. Plaintiff Motta's infringement claim is derived from the alleged ownership of the OTO. He has a claim only if ownership of Crowley's literary remains is vested in the OTO. In light of this posture, the Court can hardly overlook the question of whether the OTO is capable of such ownership.

Second, the question as to whether an entity is sufficiently well-defined to be legally cognizable is so fundamental to the effectiveness of the Court's ultimate order that the Court must consider the issue on its own motion. It is in essence a consideration going to justiciability, which may be raised *sua sponte. Cf. Bergstrom v. Bergstrom,* 623 F.2d 517, 519 n. 1 (8th Cir.1980) (issue of ripeness may be raised *sua sponte* at any stage of proceedings); *Juidice v. Vail,* 430 U.S. 327, 331–32, 97 S.Ct. 1211, 1215–16, 51 L.Ed.2d 376 (1977) (issue of standing raised *sua sponte* ).

Accordingly, it is ORDERED that Judgment be entered in favor of Defendant.

So ORDERED.