**Bradley E. MURRAY, et al., Plaintiffs,**

v.

**Helen SEVIER, et al., Defendants.**

**No. CIV. A. 94–D–1266–N.**

United States District Court,
M.D. Alabama,
Northern Division.

June 8, 1999.

---

Bobby Lee Cook, Cook & Palmour, Summerville, GA, Robert Blakey, University of Notre Dame Law School, Kresge Law Library, Notre Dame, IN, Randall E. Fisher, Wichita, KA, Paul B. Weeks, III, Wichita, KS, for Bradley Murray, as a member and legal representative of the

Bass Anglers Sportsman Society, plaintiffs.

J. Allen Maines, Eric Lang, G. Mark Cole, Paul, Hastings, Janofsky & Walker, Atlanta, GA, N. Lee Cooper, Jayna Partain Lamar, Carl Stanley Burkhalter, Maynard, Cooper & Gale, P.C., Birmingham, AL, Joseph B. Haynes, Michael R. Smith, Letitia McDonald Brown, King & Spalding, Atlanta, GA, for Ray W. Scott, Jr., B.A.S.S., Inc., Helen Sevier, Jemison Investment Co., Inc. aka Jemison, Inc., Karl L. Dabbs, James D. Davis, defendants.

## MEMORANDUM OPINION AND ORDER

DE MENT, District Judge.

Before the court are the following Motions for Summary Judgment:

1. Plaintiff Bradley E. Murray ("Plaintiff") submitted his Motion for Partial Summary Judgment ("Pl.'s Mot.") on February 2, 1998.[1] In support of his Motion, Plaintiff also filed both a Statement of Uncontroverted Facts ("Pl.'s Facts") and a Memorandum of Law ("Pl.'s Br.") on February 2, 1998. On May 6, 1998, Defendant Ray W. Scott ("Scott") filed both a Response to Plaintiff's Statement of Uncontroverted Facts and a Brief in Opposition to Plaintiff's Motion for Partial Summary Judgment, which the court construes as a Response ("Scott's Resp."). Also on May 6, 1998, Defendants Helen Sevier ("Sevier"), Karl L. Dabbs ("Dabbs"), and B.A.S.S., Inc. ("BASS") filed a Brief in Opposition to Plaintiff's Motion for Partial

---

1. For purposes of clarification, the court notes that Plaintiff actually filed two Motions for Partial Summary Judgment. The first was filed on March 13, 1997, and included separate documents entitled Statement of Uncontroverted Facts and Memorandum of Law in Support of Plaintiff's Motion for Partial Summary Judgment. By the court's Order entered on April 14, 1997, Plaintiff's Motion for Summary Judgment was stayed pending the court's decision on Defendants' Motions to Dismiss. In a Supplemental Order entered on December 30, 1997, the court directed Plaintiff to resubmit his Motion for Partial Summary Judgment on or before February 2, 1998. Because Plaintiff's arguments are essentially the same in both motions, and because Defendants directly responded to the resubmitted Motion, the court will limit all references and citations to the Motion filed on February 2, 1998.

Summary Judgment, which the court construes as a Response (collectively, "BASS's Response"). Defendants Sevier, Dabbs, and BASS also filed a Combined (1) Response to Plaintiff's Statement of Uncontroverted Facts and (2) Statement of Uncontroverted Facts in Support of Defendants' Motion for Summary Judgment on May 6, 1997. Defendants Jemison Investment Company ("Jemison") and James Davis ("Davis") filed both a Response to Plaintiff's Statement of Uncontroverted Facts and a Statement of Material Facts and Memorandum of Law in Opposition to Plaintiff's Motion for Partial Summary Judgment, which the court construes as a Response ("Jemison and Davis' Resp."), on May 6, 1998.

2. Defendants Sevier, Dabbs, and BASS also filed a Motion for Summary Judgment on May 6, 1998. In Support of their Motion, they also filed a Combined (1) Response to Plaintiff's Statement of Uncontroverted Facts and (2) Statement of Uncontroverted Facts in Support of Defendants' Motion for Summary Judgment ("BASS's Facts") on May 6, 1997. They also filed a Brief in Opposition to Plaintiff's Motion for Partial Summary Judgment and in Support of Their Cross–Motion for Summary Judgment ("BASS's Br.") on May 6, 1998. Plaintiff filed a Response to BASS's facts on July 13, 1998. Plaintiff also filed an Opposition to Defendant[s] Sevier, Dabbs, and BASS Motion for Summary Judgment, which the court construes as a Response, on July 13, 1998. Defendants filed a Reply on July 17, 1998.

3. Defendants Jemison and Davis also filed a Motion for Summary Judgment and a Statement of Material Facts and Brief in Support of Motion for Summary Judgment ("Jemison & Davis' Br.") on July 7, 1998. Plaintiff filed both a Response to Defendant Jemison Investment Company's and James Davis' Motion for Summary Judgment and an Opposition to Defendants Jemison and Davis' Motion for Summary

Judgment, which the court construes as a Response, on August 3, 1998. Defendants Jemison and Davis filed a Reply ("Jemison & Davis' Reply") on August 7, 1998 and a Supplemental Submission of Authority in Support of Motion for Summary Judgment on August 27, 1998.

4. Defendant Scott filed a Motion for Summary Judgment, a Statement of Uncontroverted Facts in Support of Motion for Summary Judgment, and a Memorandum in Support of Motion on July 7, 1998 ("Def. Scott's Br."). Plaintiff filed both a Response to Defendant Scott's Statement of Uncontroverted Facts and an Opposition to Defendant Scott's Motion for Summary Judgment, which the court construes as a Response, on August 3, 1998. Defendant Scott filed a Reply on August 7, 1998 and a Supplemental Submission of Authority in Support of Motion for Summary Judgment on August 28, 1998.

After a thorough review of the arguments of counsel, the relevant law, and the record as a whole, the court finds that Plaintiff's Motion for Summary Judgment is due to be denied and that Defendants' Motions for Summary Judgment are due to be granted.

## I. JURISDICTION AND VENUE

The court properly exercises subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332. The Parties heretofore contested venue, but those issues were resolved by the court in previous opinions. *See Murray v. Sevier*, 156 F.R.D. 235, 251 (D.Kan.1994) (transferring venue to the United States District Court for the Middle District of Alabama pursuant to 28 U.S.C. § 1404(a)); *see also Murray v. Sevier*, 993 F.Supp. 1394, 1399 (M.D.Ala.1997) (refusing to overturn the transferor court's decision). Additionally, the Parties have not contested personal jurisdiction subsequent to the case's transfer to the Middle District of Alabama. *See*

*generally Murray v. Sevier,* 156 F.R.D. at 250 (questioning whether the Kansas District Court had personal jurisdiction over Defendants Sevier, Dabbs, Davis, and Jemison).

## II. SUMMARY JUDGMENT STANDARD

On a motion for summary judgment, the court is to construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Summary judgment can be entered on a claim only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). As the Supreme Court has explained the summary judgment standard:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no 'genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citing Fed.R.Civ.P. 56(c)).

The trial court's function at this juncture is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citations omitted). A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *see also Barfield v. Brierton,* 883 F.2d 923, 933 (11th Cir.1989).

The party seeking summary judgment has the initial burden of informing the court of the basis for the motion and of establishing, based on relevant "portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' " that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548 (quoting Fed. R.Civ.P. 56(c)). The mechanics of satisfying the initial burden vary, however, depending upon which party, the movant or the nonmovant, bears the burden of proof at trial. *See Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115 (11th Cir.1993) (detailing the nature of the parties' responsibilities when preparing or defending against a motion for summary judgment).

Once this initial demonstration under Rule 56(c) is made, the burden of production, not persuasion, shifts to the nonmoving party. The nonmoving party must "go beyond the pleadings and by [his or] her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(e)). In meeting this burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). That party must demonstrate that there is a "genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348; *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. An action is void of a material issue for trial "[w]here the record

taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348.

## III. FACTUAL BACKGROUND

In 1967, Defendant Scott left his employment as an insurance agent and began organizing bass fishing tournaments for profit.[2] (Scott's May 2, 1998 Aff. ¶¶ 4–6.) Defendant Scott personally borrowed money and sold items of personal property, including his interest in a fishing tackle business and a boat, in order to finance the launching of these fishing tournaments. (*Id.*)

The first bass fishing tournament was held in June of 1967 at Beaver Lake, Arkansas and was entitled the "All–American Invitational Bass Tournament." (*Id.* ¶ 4; Scott's Ex. J.) Entrants paid $100 to participate in the tournament, and winners

---

2. Plaintiff admits that Defendant Scott organized said tournaments, but argues that "because they were 'for-profit' they were unlawful under 18 U.S.C. § 1301 et seq." (Pl.'s Resp. to Def. Scott's Statement of Uncontroverted Facts at 10.) Specifically, Plaintiff argues that "only nonprofit fishing contests have been exempt from federal criminal laws." (Pl.'s Resp. to Defs. Sevier, Dabbs, & BASS's Mot. for Summary Judgment at 2.) Thus, according to Plaintiff, if BASS is merely an extension of Defendant Scott's fishing tournaments, "federal law requires that it be operated as a nonprofit organization."

Defendants argue that 18 U.S.C. § 1301, et seq. applies to criminal lottery laws and that the fishing tournaments at issue here do not qualify as a lottery because of the skill that is involved in winning said tournaments. (Defs. Sevier, Dabbs, & BASS's Reply at 2.) Defendants further argue that to their knowledge, "no federal agency has ever investigated or claimed that old or new BASS, Inc., violated federal lottery laws by conducting fishing tournaments." (*Id.* at 3.)

The Federal Lottery Statute, codified at 18 U.S.C. § 1301 et seq., makes it a federal crime to import, transport, or mail lottery tickets or related matter throughout the stream of interstate commerce, or to broadcast lottery information over federally licensed radio or television stations. *See* 18 U.S.C. §§ 1301–04. On August 16, 1950, Congress amended the statute to add § 1304, wherein Congress specifically exempted nonprofit fishing contests from the purview of the statute. *See* S. Rep. 2242, 81st Cong. (1950)(enacted). Congress was prompted to adopt said section because the Postmaster General had ruled that "publications containing advertisements of fishing contests involving the three elements of prize, consideration, and chance" were unmailable under the lottery laws. *Id.* However, it was their "considered judgment that Congress, in enacting the lottery laws, never envisaged their application to such innocent pastimes as the typical fishing contest, which has a solid basis of respectability and wholesomeness far removed from the reprehensible type of gambling activity which it was paramount in the congressional mind to forbid." *Id.*

Plaintiff would have this court choose one of two alternatives: either that Defendant Scott violated the law by holding for-profit tournaments, or that said tournaments were really non-profit contests and thus, since BASS was a continuation of said tournaments, Bass is an unincorporated association. However, the court need not so choose because both alternatives yield the same result. For instance, even if Defendant Scott did exactly what Plaintiff wanted him to do, the court finds that he still arguably would have violated the law. That is, if Defendant Scott had used the proceeds of this tournament to form BASS as an unincorporated association, and BASS had in turn used those proceeds for noble conservation purposes, BASS itself arguably would have violated the statute. Congress limited the exemption to fishing contests not conducted for profit, meaning "a self-liquidating type of undertaking, whose receipts are fully consumed in defraying the actual costs of operation and are not intended or used for any other collateral purpose such as establishment of a fund for civic, philanthropic, or charitable objects, no matter how benevolent or worthy." *Id.*

Thus, the effect of the statute is the same regardless of which of Plaintiff's alternatives is selected. Accordingly, the court finds that the statute has no effect on the court's analysis of whether BASS is an unincorporated association. Additionally, the court further finds that, in 1988, Congress definitively answered in the negative the question of whether a for-profit fishing tournament violates the statute, by amending it to add the sentence " 'Lottery' does not include the placing or accepting of bets or wagers on sporting events or contests." 18 U.S.C. § 1307(a)(2)(B).

were given cash and trophies as prizes. (Scott's Ex. J.) Over 100 fisherman from thirteen states participated. (*Id.*)

Due to the success of the Beaver Lake tournament, Defendant Scott organized a second bass fishing tournament in October of 1967, which was held on Lewis Smith Lake in Winston County, Alabama. (*Id.;* Scott's May 2, 1998 Aff. ¶ 5.) This tournament was entitled the "Dixie Invitational Bass Tournament" and attracted approximately 114 participants from fourteen states. (*Id.*)

On his 1967 personal income tax return, Defendant Scott reported the income and expenses of both 1967 fishing tournaments. (Diamond's Aff. ¶ 3.) Attached as a part of his tax return, Defendant Scott also submitted a "Schedule C" (Form 1040), "Profit (or Loss) From Business or Profession (Sole Proprietorship)" ("Schedule C"), which reported revenues of $29,332 and expenses of $27,045 under the business name "Dixie Invitational Bass Tournament." (*Id.*) Defendant Scott listed his principal business activity as "Services" and designated his product as "Fishing tournaments." (*Id.*) The Employer Identification Number listed on his 1967 Schedule C is 63–0521285. (*Id.*)

Defendant Scott met Homer Circle ("Circle") at one of these first two fishing tournaments. (Circle's Dep. at 21.) According to Circle, Defendant Scott called him on the telephone asked him to help him name his organization. (*Id.* at 22.) "[Defendant Scott] said he would like to have a name for the association but couldn't come to one that really suited him, but he wanted to use the word bass some-

how in there. And he said, can you think of any name that would use the B–A–S–S in the name." (*Id.*) Circle suggested that Defendant Scott call Bob Steber ("Steber"), who was the outdoor editor of the National Tennessean Newspaper. (*Id.*) According to Circle, Defendant Scott called Steber and Steber created the name "B.A.S.S. Anglers Sportsman Society." (*Id.*) Circle added that the word society was included in the name "[o]nly because it had an S in it and it fit the name, the acronym." (*Id.* at 22.)

On January 5, 1968, Defendant Scott sold to Don Butler ("Butler") in Tulsa, Oklahoma the first membership in B.A.S.S.[3] (Scott's May 2, 1998 Aff. ¶ 11; Butler's Dep. at 21.)

> We were driving down the street in Tulsa, Oklahoma and [Defendant Scott] said do you believe in my concept of this organization, do you think it will work. And I said yeah, I think it will work. And he said do you think it will work strongly enough that you would sign up for it. And I said I would, how much is the life membership. And he said $100. We stopped and picked that receipt up in a little five and 10 cent store....

(Butler's Dep. at 58–59.) After Butler became the first member of BASS, Butler also loaned Defendant Scott $10,000. (*Id.* at 48.) Defendant Scott needed the money for postage because "he was trying to encourage new members in the form of mailings." (*Id.* at 38.) Defendant Scott personally paid back the loan to Butler. (*Id.* at 39, 49.)

On or about January 11, 1968, Defendant Scott went to Chattanooga, Tennes-

---

**3.** The court notes Plaintiff's argument that "[i]t is disputed who is the 'first member' of B.A.S.S. While Don Butler testified that he was the first 'member' of B.A.S.S., Scott has also stated that he is the first member of B.A.S.S." (Pl.'s Resp. to Defendant Scott's statement of Uncontroverted Facts at 11.) In the above context, the court is merely refer-

ring to the first member who paid dues to join B.A.S.S. None of the Parties dispute that Butler was the first official paying member. Furthermore, the court need not decide whether Defendant Scott is in fact the first "member" of B.A.S.S., because the court finds that said dispute is immaterial at this stage of the proceedings.

see to attend a meeting of approximately 40 people who were potentially interested in joining BASS. (Sharp's Dep. at 34.) Defendant Scott attended the meeting with Harold Sharp ("Sharp"), an avid fisherman who had participated in the two 1967 fishing tournaments. (*Id.* at 25.) Defendant Scott had previously learned that Sharp was forming a local Chattanooga bass club and called him on the telephone. (*Id.* at 30.) "And I recall Ray saying at that time, well, you guys are getting ahead of me. And I said why, and [he] said, well, I'm thinking about starting a national organization of bass fisherman." (*Id.* at 31.)

Sharp introduced Defendant Scott at the meeting and "[Defendant Scott] got up and explained to the people that was [sic] in the room the purposes and everything of the BASS Anglers Sportsman Society and how it was going to be organized.... And at that particular time, as Ray told us, he had one member which was Don Butler. And when that meeting was over we signed up 19 people and since I was elected president of the Chattanooga Bass Club,[4] I claimed to be the second member in the BASS Anglers Sportsman Society." (*Id.* at 34–35.) Members paid $10 for the membership in BASS and received patches from Defendant Scott. (*Id.* at 36.) Sharp testified that at the time he joined BASS, he knew that Defendant Scott personally owned the business and was operating the group for his own profit.[5] (*Id.* at 37–39.) "It was just assumed that this was—this belonged to Ray Scott, that this was his organization and, you know, if you want to belong you paid $10. If you didn't—I recall one of the fisherman telling me, said, Ray Scott is going to make a ton of money off you guys. And I said, so be it." (*Id.*) Additionally, although Sharp was one of the original members of BASS, Sharp had no expectation that he owned any right to the assets or property of BASS, or that he had any right to control BASS. (*Id.* at 40–42.)

Also in January of 1968, Defendant Scott prepared press releases and sent them to newspapers across the country. (Pl.'s Exs. 20–21; Def. Scott's Answer ¶ 42.) One newspaper, The State, published in Columbia, South Carolina, reported on January 21, 1968 that Defendant Scott was in the process of organizing BASS.[6] (Pl.'s Ex. 20.) The article quotes Defendant Scott as saying that the "tournaments

---

4. The Chattanooga Bass Club is not to be confused with the BASS entity at issue here. Those nineteen members paid separate membership dues, $15, to join the Chattanooga Bass Club, and they also paid an additional $10 in BASS Anglers Sportsman Society dues. (*Id.* at 36.) Furthermore, the Chattanooga Bass Club had separate officers, all of whom were elected by the members of the Chattanooga Bass Club. (*Id.*)

5. Plaintiff objects to the statement that Sharp knew that Defendant Scott personally owned the business, stating "[f]rom the time B.A.S.S. was formed, defendant Scott continuously told B.A.S.S. members that the Society and its magazine belong to B.A.S.S. members.... Again and again, defendants told B.A.S.S. members that the Society is 'Your society' and that BASS Master Magazine is the Society's magazine, the members' magazine, and the memberships' magazine." (Pl.'s Resp. to Defendant Scott's Statement of Uncontroverted Facts at 8 (emphasis omitted).) The court notes Plaintiff's argument but finds that it is irrelevant with regard to the membership of Sharp and the other members who joined in Chattanooga. These nineteen members joined around January 11, 1968, prior to the publication of the first issue of BASS Master Magazine, and, thus, the court finds that any statements made in said magazine are irrelevant as to these members. These members joined due to statements made by Defendant Scott when he attended the Chattanooga meeting.

6. The court notes that Defendant Scott has objected to the admission of this article on authenticity grounds. Specifically, Defendant Scott argues that it has not been properly authenticated because there is neither an official date nor a source printed on the article. Rather, Plaintiff has merely handwritten what he contends to be the proper date and source on the xerox copy of the article. However, Defendant Scott "presumes that...the Exhibit[ ] which he moved to strike on authentication grounds *could* be authenticated by the Plaintiff, *but [it has] not been.*" (Def. Scott's

convinced me there is a common bond among bass fishermen.... They are a unique, dedicated bunch. I believe if the energies of these fishermen can be funneled into a national organization, the group can serve to benefit this country's conservation program, with particular efforts in conserving our bass fishing waters." (*Id.*) According to the article, BASS would also publish a new publication, "The BASSmaster." (*Id.*)

In the Spring of 1968, the first issue of BASS Master Magazine ("BASS Master") was published. (Pl.'s Ex. 22.) This issue was not sold to the public, but was mailed only to BASS members. (Pl.'s 5th Am. Compl: ¶ 44; Sevier, Dabbs, & BASS's Answer ¶ 44.) On page one of BASS Master, Defendant Scott is identified as the "editor," but not as the owner or proprietor of BASS or BASS Master. (Pl.'s Ex. 22.) On page two of BASS Master, readers are told that "membership of the BASS Anglers Sportsman Society (BASS) is open to anyone who loves bass fishing and shares the desire to advance our Bass fishing sport, and the Society purpose." (*Id.*) Readers are further informed that BASS Master "is fashioned to serve the interest of the BASS membership. It is our hope and dream that from this humble first edition a magazine will develop that will answer the specific needs and interest of the Bass fisherman. This is your magazine. We want your comments and suggestions on how you'd like it fashioned." (*Id.*)

Furthermore, the initial issue of BASS Master listed eight separate paragraphs under the heading entitled "BASS PURPOSES":

To organize the Bass Angler's [sic] of America.

To stimulate public awareness of Bass fishing as a major participation sport. To elevate our sport to a place of prominence with golf, bowling, boat racing and billiards.

To improve our skill as Bass Anglers through the exchange of expert Bass catching techniques and ideas.

To offer our state conservation departments our organized moral and political support and encouragement. To promote full adherence to all conservation codes.

To demand adequate water standards and legal enforcement of existing regulatory standards. To detect and report any polluter and call public and political attention to his crime.

To encourage private and governmental study into why fishing on our lakes and streams "go bad," and what can be done

Reply Brief in Support of his Motion to Strike at 13 (emphasis in original).)

However, the court is willing to overlook Plaintiff's lack of thoroughness. First, Fed. R.Evid. 902(6) provides that extrinsic evidence of authenticity is not required with respect to newspapers and other periodicals. *See* Fed.R.Evid. 902(6). The Advisory Committee's Notes justify the exception, stating that "[t]he likelihood of forgery of newspapers or periodicals is slight indeed. Hence no danger is apparent in receiving them." *Id.* at advisory committee's notes.

Additionally, although it is true that the xerox copy of the article does not contain a printed date or source, it is apparent from the text of the article that it was published sometime in early 1968. For instance, the article states that Defendant Scott "directed the All-American Bass Tournament at Beaver Lake, Ark., and the Dixie Invitational at Lewis Smith Lake, Ala., last year." (Pl.'s Ex. 20.) Because it is undisputed that these tournaments occurred in 1967, the "last year" language places the date of this article's publication in 1968. Therefore, the court finds that Plaintiff's Exhibits 20 and 21 have been sufficiently authenticated.

Furthermore, the court finds that Exhibit 20 qualifies as an ancient document under Fed.R.Evid. 901(8) because the article is over thirty years old. As such, any statements contained therein are subject to the ancient documents exception to the hearsay rule. *See* Fed.R.Evid. 803(16).

for these waters to restore and maintain top bass fishing for ourselves and our children.

To promote and encourage youth fishing. Kids don't go fishing-they are carried fishing. Instill at an early age an interest and love for this great recreation.

To present national championship BASS fishing tournaments. These BASS tournaments will bring together the nation's most dedicated Bass fisherman.

(*Id.*)

Additionally, on the same page as the "BASS PURPOSES," there was another relevant section entitled "BASS BENEFITS." The "BASS BENEFITS" section included the following pertinent information:

Each member receives a yearly subscription to THE BASSMASTER MAGAZINE—the dream of every bass fisherman. If you're tired of digging through Sports Afield, Outdoor Life, and Field and Stream looking for just one good Bass feature, you can stopp digging—THE BASSMASTER MAGAZINE is filled with exciting Bass fishing stories and techniques discussed by the expert BASS membership. This quarterly publication gives you the how, when, and where to consistantly [sic] catch more and larger strings of Bass.

THE BASSMASTER MAGAZINE will include BASS tournament information and current tournament tour schedules. THE BASSMASTER MAGAZINE will also feature up to date information on the better Bass lakes across the nation. For the true Bass

Angler, THE BASSMASTER MAGAZINE is a maddening must.

Each member also receives a beautiful silk embroidered official Bass member's patch. This patch should be displayed on your fishing jacket or coat to show your supporting membership. . . .

(*Id.*) Finally, on the last page of this initial edition of BASS Master, a membership application was enclosed with the language "I understand that I am entitled to a subscription to the BASSMASTER Magazine and all rights and privileges of bass Membership." (*Id.*)

Three additional issues of BASS Master were published in 1968: the Summer 1968 Edition, the Fall 1968 Edition, and the Winter 1968 Edition. (Pl.'s Exs. 23–25.) Although these editions apparently did not contain the above-listed "BASS PURPOSES,"[7] they did contain other language relied upon by Plaintiff. For instance, the cover of all three remaining 1968 Editions states that the BASS Master is "FOR THE MEMBERSHIP OF THE BASS ANGLERS SPORTSMAN SOCIETY." (Pl.'s Ex. 23 (emphasis in original).) These Editions also state that BASS Master is "[p]ublished in Montgomery, Alabama exclusively for the membership of Bass Anglers Sportsman Society." (Pl.'s Exs. 24, 25.) Defendant Scott is again listed as "your editor." (Pl.'s Exs. 23–25.)

Throughout 1968, BASS continued to acquire additional members. Included among these initial members were Jimmy Holt ("Holt"), Homer Circle ("Circle"), Ray Murski ("Murski"), and Bodie McDowell ("McDowell"), all of whom joined BASS in 1968. (Holt's Dep. at 29; Circle's Dep. at 22; Murski's Dep. at 34–35; McDowell's Dep. at 19.) None of these initial members drafted any articles, by-

---

**7.** Or at least, if these three editions contained the "BASS PURPOSES" section, these sections are not before the court, as Plaintiff has only submitted portions of the Summer, Fall, and Winter Editions and the purposes are not contained therein. Defendant Scott contends that said purposes were not published in BASS Master again for several years. (Def. Scott's Br. at 11 n.5).

laws, or a constitution for BASS.[8] (Holt's Dep. at 38; Circle's Dep. at 28–31; Murski's Dep. at 37–38; McDowell's Dep. at 51.) Furthermore, all of these members believed that Defendant Scott personally owned BASS and that he was operating the organization for his own profit.[9] (Holt's Dep. at 35–36; Circle's Dep. at 23–25; Murski's Dep. at 21–22; McDowell's Dep. at 47–48.)

On Defendant Scott's 1968 income tax return, he reported gross receipts under the business name "Bass Anglers Sportsman Society" in the amount of $95,333, costs of $43,933 and expenses of $51,069. (Diamond's Aff. ¶ 4.) He reported this income by again completing a form entitled "Schedule C (Form 1040), Profit (or Loss) From Business or Profession (Sole Proprietorship)." (*Id.*) The employer identification number used on Defendant Scott's 1968 tax return is the same as that used in 1967, 63–0521285. (*Id.*) Additionally, Defendant Scott depreciated four items of business property for which depreciation had been taken on his 1967 tax return under the business name "Dixie Invitational Bass Tournament." (*Id.*)

On April 30, 1969, Defendant Scott signed a document entitled "Certificate of Incorporation," in which he purported to transfer all assets and liabilities of "Ray W. Scott, d/b/a Bass Anglers Sportsman Society" to Bass Anglers Sportsman Society of America, Inc. (*Id.* ¶ 6; Scott's May 2, 1998 Aff. ¶ 8; Pl.'s Ex. 9.) The Certificate of Incorporation listed the following pertinent purposes for which the "corporation" was formed:

> To form and to operate an organization, association, or society for the promotion of sport fishing particularly Bass fishing. To organize, sanction, authorize, or charter local chapters, societies or clubs to carry on the purposes of the corporation. To publicize and promote by bringing to the attention of the public through the press, magazines, pamphlets, and by other means, the benefits of conservation of natural resources and the dangers of water pollution to sport fishing. To publish, print, and sell magazines and periodicals including the sale of advertising space therein; to furnish information and publicity to Bass fisherman and sportsmen as to fishing areas, equipment and accommodations.
>
> To organize, promote, and carry on fishing tournaments under the name ALL AMERICAN TOURNAMENTS and to do all things necessary to carry out the objects of this corporation.

(Def. Scott's Ex. 51.)

Attached to the Certificate of Incorporation as "Exhibit A" is the stock subscription list for Bass Anglers Sportsman Society of America, Inc. (*Id.*) It demonstrates that Defendant Scott was to receive 9,998

---

8. Plaintiff admits that none of the members drafted any type of bylaws or charter, but argues that "Scott had the obligation to perform that function when he agreed to 'organize the Bass Angler's Sportsman Society.'" (Pl.'s Response to Defendants Sevier, Dabbs, and BASS's Statement of Uncontroverted Facts at 10.) Although the court notes Plaintiff's argument, the court also notes that said argument is contingent upon this court's finding that BASS was, in fact, an unincorporated association, as Plaintiff claims. Thus, at this juncture, the court focuses merely on the fact that Plaintiff admits that neither Defendant Scott, nor any member of BASS, drafted any sort of articles, bylaws, or constitution.

9. Plaintiff admits these statements to be true, but qualifies the statements with regard to Holt and Circle. (Pl.'s Resp. to Defendants Sevier, Dabbs, and BASS, Inc.'s Statement of Uncontroverted Facts at 9.) Plaintiff clarifies that Holt actually testified that although he never had any discussions with Defendant Scott regarding the ownership of BASS, he assumed that Defendant Scott owned BASS because of his long friendship with Defendant Scott. (Holt's Dep. at 82–84). Likewise, Circle did not actually discuss the ownership of BASS with Defendant Scott; rather, he assumed Defendant Scott owned it because he was its president. (Circle's Dep. at 59.)

of the 10,000 shares of stock to be issued by the corporation. (*Id.*) It further states that "[a]ll of the above subscriptions will be paid by the transfer of accounts receivable, office equipment, inventory, office supplies, fishing equipment, mailing lists and the Bassmaster Magazine subject to the unpaid obligations of Ray Scott, D.B.A. Bass Anglers Sportsman Society." (*Id.*) A copy of the Certificate of Incorporation was filed on May 16, 1969 in Montgomery, Alabama. (Diamond's Aff. ¶ 5.)

In 1980, the Bass Anglers Sportsman Society of America, Inc. was renamed "B.A.S.S., Inc." (Diamond's Aff. ¶¶ 2,7, 9–10; Defendant Sevier's May 6, 1998 Aff. ¶ 4; Defendant Davis' April 5, 1998 Aff. ¶ 2.) On July 11, 1986, J.S. Acquisition Co. Inc., a corporation owned by Defendants Sevier, Dabbs, Jemison, and Davis,[10] purchased substantially all of the assets of B.A.S.S., Inc. from Defendant Scott for a purchase price of $13,383,588, plus various liabilities. (Def. Sever's Aff. ¶¶ 11–12; Def.s Jemison and Davis' Br. at 3–4.) After selling substantially all of its assets, Defendant Scott's B.A.S.S., Inc. dissolved in 1986. (Def. Scott's March 9, 1998 Aff. ¶ 9; Diamond's Aff. ¶ 7.) Furthermore, also in 1986, J.S. Acquisition Co., Inc., changed its name to B.A.S.S., Inc. (Def. Sevier's Aff. ¶ 12; Def. Davis' Aff. ¶ 2.)

Plaintiff became a member of BASS in 1982. (Pl.'s 5th Am. Compl. ¶ 10.) On February 14, 1992, Plaintiff filed his original Complaint in the United States District Court for the District of Kansas. By order entered on June 8, 1994, the Kansas District Court transferred this matter to the United States District Court for the Middle District of Alabama. *See Murray v. Sevier*, 156 F.R.D. 235 (D.Kan.1994).

In Plaintiff's Fifth Amended Complaint, he seeks, on behalf of himself and the approximately 500,000 current members of BASS, to recover funds which he alleges either have been converted or stolen from BASS members by Defendants. (Pl.'s 5th Am. Compl. ¶ 3.) In sum, Plaintiff alleges that the entity Defendant Scott originally created in 1967 was actually an unincorporated association and, therefore, that Defendant Scott could not lawfully incorporate said entity in 1969 without the consent of the other BASS members. (*Id.* ¶¶ 60, 149.) By incorporating said entity as described above, Plaintiff argues that Scott and his successors have committed three torts against BASS members. First, Murray contends that Defendants committed fraud against BASS members by diverting their membership dues and advertising revenues away from the stated purposes of the association and to the Defendants for their own individual benefit and gain. (Pl.'s 5th Am. Compl. at 55–59.) Second, Plaintiff alleges that Defendants have committed fraudulent concealment by concealing material facts from BASS members, conduct which tolled the running of the applicable statute of limitations. (*Id.* at 64–65.) Finally, Plaintiff alleges that Defendants have breached their fiduciary duties to BASS members by continually diverting members' dues, advertising revenues, and other assets away from their association and its purposes for Defendants' own personal uses and benefits. (*Id.* at 58–61.)

Plaintiff prays that this court will afford all class members a number of remedies grounded in both equity and law. (*Id.* at 60–64.) First, Plaintiff requests that the court order all assets of BASS to be held by Defendants in a constructive trust for the sole benefit of Plaintiff and the class. (*Id.* at 63.) Second, Plaintiff requests the court to permanently restrain Defendants from being involved or associated with

---

10. The court notes Defendants' Jemison and Davis' arguments with regard to their purported limited involvement and liability in BASS. (Def.s Jemison & Davis' Br. at 3–6.) However, the court finds that it need not reach this issue until it resolves the initial issue of whether BASS is an unincorporated association.

BASS in any manner. (*Id.* at 64.) Plaintiff also requests both actual damages, which Plaintiff estimates to exceed approximately $75,000,000.00 but the actual amount of which can only be determined by an accounting, and punitive damages in an amount sufficient to punish Defendants and to deter them and others from similar conduct in the future. (*Id.* at 60–61.)

This cause is currently before the court on the Parties' Motions for Summary Judgment.[11] Although the Parties disagree as to the proper disposition of this matter, they all agree that the threshold issue before the court is whether BASS is an unincorporated association.[12] The court finds that it is not and, accordingly, dismisses Plaintiff's lawsuit.

---

**11.** Because the procedural history of this case is extensive, both in the United States District Court for the District of Kansas and in this court, the court declines to waste scarce judicial resources by outlining it again here. Instead, the court refers all interested readers to the six previously published opinions in this action: *Murray v. Sevier*, No. 92–1073–K, 1992 WL 75212 (D.Kan. March 13, 1992)(finding sufficient evidence that Plaintiffs engaged in "judge shopping" and therefore denying Plaintiffs' Motion to Amend and dismissing Plaintiffs' Amended Complaint); *Murray v. Sevier*, 145 F.R.D. 563 (D.Kan.1993)(finding that Murray's Motion For Leave to File Third Amended Complaint was due to be denied since Murray's action was a derivative action and not a direct action and that Murray's First Amended Complaint was due to be dismissed for improper service); *Murray v. Sevier*, 149 F.R.D. 638 (D.Kan.1993)(denying Murray's Motion For Reconsideration of Kansas court's decision to dismiss Second Amended Complaint and the denial of Murray's Motion For Leave to File Third Amended Complaint and limiting Murray's right to assert RICO claim in Fourth Amended Complaint); *Murray v. Sevier*, 156 F.R.D. 235 (D.Kan.1994)(granting Murray's Motion to File Fourth Amended Complaint, requiring Murray to plead a Federal Rule of Civil Procedure 23.2 class action, striking certain scandalous material from the Fourth Amended Complaint, and transferring the matter to the Middle District of Alabama); *Murray v. Sevier*, 929 F.Supp. 1461 (M.D.Ala.1996)(denying Murray's Motion For Recusal); *Murray v. Sevier*, 993 F.Supp. 1394 (M.D.Ala.1997) (denying Defendants' Motions to Dismiss).

---

## IV. DISCUSSION

### A. *Choice of Law*

■ Before addressing the merits of the Parties' arguments, the court must first decide which state's substantive law governs Plaintiff's claims. At the outset, the court notes that Plaintiff devotes a large portion of his allotted space [13] arguing that the Parties litigated this issue in Kansas and "the Kansas District Court ruled that Alabama law applied." (Pl.'s Choice of Law Br. at 1.) Plaintiff also contends that Defendants argued in Kansas that Alabama law applied and, therefore, "Defendants are estopped from now arguing that the law of a state (or states) other than Alabama applies to this action or to plaintiff's claims." (*Id.* at 6 n. 6.)

---

**12.** Indeed, Plaintiff's counsel, Mr. Fisher, represented in a hearing held by the court on the Motions for Summary Judgment that all of the pending "motions are essentially on the same issue. And that is, what is BASS." (Tr. of August 13, 1998 Hearing at 10.) Furthermore, Mr. Fisher stated that the court should decide this issue as a matter of law. (*Id.*) Specifically, Mr. Fisher stated:

I would urge the court to consider the idea that because all of the parties have agreed that this is a matter to be disposed of by summary judgment, that the Court is in the best position to deal with this case at this time on that basis. And, in fact, it's I would think nearly a concession by the parties that this is not a matter that has issues that are appropriate for trial.... [I]t's the obligation of the Court to determine the legal effect in this kind of a case of those facts. It's a question of law for the Court to decide whether BASS is an association as a matter of law, or whether BASS was a proprietorship. And those are the issues that I am going to focus on this morning.
(*Id.*)

**13.** By Order entered on September 8, 1998, the court limited the Parties to twenty pages in which they were to discuss their respective positions regarding choice-of-law rules. Plaintiff devotes a third of his brief to the argument that this issue has previously been decided by the United States District Court for the District of Kansas.

In response, Defendants argue that the Kansas District Court did not rule that Alabama law governs the issue of whether BASS is an unincorporated association. Additionally, Defendants admit that in 1993, they argued that Alabama law applied to the issue of whether an unincorporated association was formed. However, they contend that they:

> made this statement years before the parties had fully developed the factual record in this case and particularly before the parties had developed the necessary facts.... The early members were not deposed until February 1998 and the facts derived from those depositions conclusively establish that the formation of the alleged unincorporated association occurred (if at all) in Oklahoma.

(Def.s' Sevier, Dabbs, & BASS's Choice of Law Brief at 9–10.) Therefore, Defendants argue that the doctrine of judicial estoppel does not bar their current contention that Oklahoma, and not Alabama, is the proper state's substantive law to apply in the instant case.

In *Murray v. Sevier,* 156 F.R.D. at 251, the United States District Court for the District of Kansas ("Kansas District Court") found that the present action should be transferred to this court pursuant to 28 U.S.C. § 1404(a). As a factor in its venue analysis, the Kansas District Court considered the possibility that Alabama law would apply to the present case. Specifically, the court stated, in pertinent part:

> [T]o the extent this case ultimately turns on the application of Alabama substantive law, it would be preferable for an Alabama federal court to adjudicate this case, especially in light of the complexities this court has already encountered in attempting to ascertain and apply Alabama law with respect to unincorporated associations.

*Id.* at 256 (emphasis added). Although Plaintiff represented to this court that the Kansas District Court previously had decided this issue, it is apparent to this court, based on the foregoing excerpt, that the Kansas District Court did not make any affirmative finding with regard to choice-of-law. First, the Kansas District Court was not applying a choice-of-law analysis; rather, it was conducting a transfer of venue analysis and, therefore, the foregoing language was written in a different context. Additionally, the court notes that the Kansas District Court did not specifically find that Alabama substantive law governs the present case. Rather, the Kansas court used language that was both qualified and uncertain, stating "to the extent that this case ultimately turns on the application of Alabama substantive law." *Id.* Therefore, the court disagrees with Plaintiff and finds that this issue has not previously been decided by the Kansas District Court. Accordingly, this court must conduct its own choice of law analysis.

The court is also unpersuaded by Plaintiff's judicial estoppel argument. Because this is a diversity case, the application of the doctrine of judicial estoppel is governed by state law. *See Original Appalachian Artworks, Inc. v. S. Diamond Assoc., Inc.,* 44 F.3d 925, 929 (11th Cir. 1995); *Lane v. Wal–Mart Stores, Inc.,* Nos. 9708121, 97–8124, 1999 WL 51808, at *6 n. 2 (10th Cir. Feb.5, 1999). "The general theory of judicial estoppel or estoppel by oath...is that a party is bound by his judicial declarations and may not contradict them in a subsequent action involving the same parties if one party has changed position in reliance on such declarations." *Griffin v. Dodge City Coop. Exch.,* 23 Kan.App.2d 139, 927 P.2d 958, 967 (1996) (citation omitted).

Defendants contend, and the court agrees, that Plaintiff has not changed his

position in reliance on the declaration at issue. Specifically, the court finds that Plaintiff has neither changed his allegations in his Complaint nor changed his dispositive motion arguments. First, Plaintiff has historically contended that the court should apply the common law, not any one state's particular law, to the present determination. Second, regardless of whether this court finds that Oklahoma or Alabama law applies, neither state has any instructive case law or statutory law with regard to this issue. Thus, this entire discussion is a case of "Tweedledum and Tweedledee," [14] as the court concludes that it is proper for it to examine the relevant common law and case law from other jurisdictions. However, for the record, the court will make a determination as to which state's law it is appropriate to apply in this context.[15]

■ Generally, federal courts sitting in diversity apply the forum state's choice-of-law rules. *See Erie R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Additionally, in transfer of venue cases arising under 28 U.S.C. § 1404(a), the transferee district court is obligated to apply the state law that would have been applied had there been no change of venue. *See Ferens v. John Deere Co.,* 494 U.S. 516, 110 S.Ct. 1274, 108 L.Ed.2d 443 (1990). Thus, because this case was transferred from the United States District Court of Kansas, this court must determine what substantive law the Kansas court would have applied and then apply that law to the case. *See Van Dusen v. Barrack,* 376 U.S. 612, 639, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964) (concluding that "a change of venue...generally should be, with respect to state law, but a change of courtrooms").

■ The formation of an unincorporated association is contractual in nature. *See Cunningham v. Independent Soap & Chem. Workers,* 207 Kan. 812, 486 P.2d 1316, 1320 (1971). In general, Kansas follows a lex loci contractus theory of contract interpretation, meaning that the law of the place where the contract was made governs construction of the contract. *See Safeco Ins. Co. v. Allen,* 262 Kan. 811, 941 P.2d 1365, 1372 (1997); *accord Four Way Plant Farm, Inc. v. NCCI,* 894 F.Supp. 1538, 1545 (M.D.Ala.1995) (finding that "the law of the state where the group was 'created' determines whether the group is an unincorporated association"); *California Clippers, Inc. v. United States Soccer Football Ass'n,* 314 F.Supp. 1057, 1068 (N.D.Cal.1970) (same). Although all Parties agree that the lex loci contractus theory is the appropriate one, the Parties differ as to where the contract of association was made.

■ Plaintiff argues that the contract of association was created in Alabama. (Pl.'s Choice of Law Br. at 17.) Specifically, Plaintiff contends that the first issue of BASS Master was published in Alabama and that said Magazine contained a number of stated purposes which constitute "a contractual offer to join an organization headquartered in Alabama and dedicated to those express organizational purposes." (*Id.*) "Therefore, until the founding purposes of B.A.S.S. were published in the Society's first issue of BASS Master Mag-

---

**14.** Lewis Carroll, Through the Looking Glass, Chap. 4 (1872).

**15.** The court notes that although the choice-of-law analysis may seem unnecessary in this context, Defendants have argued that it is entirely relevant should the court reach Plaintiff's fraud claim. On August 21, 1998, Defendant Scott filed a Notice to Raise an Issue Concerning the Law of Foreign Countries, wherein he argued, inter alia, that the law of the state in which each class member allegedly received the fraudulent misrepresentations will be applicable to that member's negligent misrepresentation claim. The court notes Defendant Scott's argument, but finds that it need not reach this issue because the court does not reach Plaintiff's fraudulent misrepresentation claim.

azine, arguably the formation of this 'national association' was not complete." (*Id.* at 16.) Plaintiff concludes by arguing that "[b]ecause this contract was (and is) to be performed primarily in and from Alabama, that state's law should apply." (*Id.* at 18.)

Defendants contend that Oklahoma law must be applied to determine whether BASS was created as an unincorporated association. Specifically, Defendants argue that "the evidence is uncontroverted that the first member joined Ray Scott's new organization in January 1968 in Oklahoma." (Def. Scott's Choice of Law Br. at 4.) Defendants argue that, because the first member joined BASS in Tulsa, Oklahoma, Oklahoma law is the proper substantive law to apply.

The court agrees with Defendants and finds that it is appropriate to apply Oklahoma law for the following reasons. First, in Plaintiff's Fifth Amended Complaint, he alleges that "defendant Scott formed the Bass Anglers Sportsman Society in Tulsa, Oklahoma." (Pl.'s 5th Am. Compl. ¶ 41.) This allegation is clearly supported by the evidence because Butler, the first official member of BASS, paid Defendant Scott $100 for a life membership and when he did so, Defendant Scott stopped at a five and dime store in Tulsa, Oklahoma, where he bought a receipt book to record the transaction. (Butler's Dep. at 59.) Additionally, the court notes that Butler joined BASS prior to the first publication of BASS Master. Thus, any agreement entered into between Defendant Scott and Butler must have existed in Tulsa at the time Butler joined, not months later when BASS Master was initially published.

Moreover, Plaintiff has never contended heretofore that the formation of the unincorporated association was contingent upon the publication of the first issue of BASS Master. Rather, Plaintiff has alleged that the formation of BASS occurred prior to the publication of BASS Master.

(*See* Pl.'s 5th Am. Compl. ¶¶ 105, 112, 157 (stating that "Scott's corporation...did not exist when B.A.S.S. was founded in 1967 or when BASS Master was first published in 1968," "Scott never made those statements to the society's membership when B.A.S.S. was founded or when BASS Master Magazine was started," and "[s]ince the founding of B.A.S.S. in 1967 to present")). All of these statements support Plaintiff's previous allegation that the creation of BASS and the publication of BASS Master were two separate events, namely that the "unincorporated association" was created in 1967, and BASS Master was published in 1968.

■ Thus, the court finds that the proper state law to apply to the present inquiry is that of Oklahoma, not of Alabama, although neither state has enacted or published any pertinent law determinative of the issue at hand. Therefore, while the court is mindful that Oklahoma law is the basis for the present determination, it will also consider relevant law from other jurisdictions.

### B. *What is BASS?*

Plaintiff requests that the court grant his Motion for Summary Judgment and declare, as an initial matter, that BASS is a national unincorporated association. (Pl.'s Br. at 5.) Plaintiff argues that BASS was founded in 1967 by Defendant Scott with "such nonprofit and charitable goals as conservation, anti-pollution efforts, promotion of bass fishing and preservation of bass fishing waters." (Pl.'s 5th Am. Compl. ¶ 34.) Because BASS was founded as an unincorporated association, Plaintiff argues that Defendant Scott could not lawfully incorporate said entity in 1969 without the consent of the other BASS members. (*Id.* ¶¶ 60, 149.)

To support his allegation that BASS is an unincorporated association, Plaintiff primarily relies on a number of statements

and phrases published in BASS Master. First, Plaintiff contends that the stated purposes of BASS published in the first issue of BASS Master create a contract of association between the members. (*Id.* ¶ 37.) In particular, Plaintiff relies heavily on the non-profit goals articulated in the first issue of BASS Master, specifically "(1) conservation of our nation's waterways; (2) the promotion of sport fishing;... and (3) promotion of 'youth fishing.'" (*Id.* ¶ 44.)

Additionally, Plaintiff emphasizes that Defendant Scott was identified as "your editor" and not the owner or proprietor of BASS or BASS Master. (*Id.* ¶ 44.) Furthermore, Plaintiff argues that BASS is referred to as a "society," wherein "members" are told that "[t]his is your magazine" and that "membership...is open to anyone who loves bass fishing and shares the desire to advance our Bass fishing sport, and the Society purpose." (Pl.'s Ex. 22.)

Moreover, Plaintiff has filed numerous exhibits derived from statements or comments purportedly made by various Defendants after Defendant Scott incorporated BASS in 1969. Plaintiff fervently argues the significance of a series of antipollution lawsuits that he contends were filed by Defendant Scott in the 1970's. (Pl.'s Br. at 9.) He argues that these lawsuits were "initiated and prosecuted...to generate publicity for, and public recognition of, B.A.S.S. and its founding purposes, and to increase the number of dues-paying B.A.S.S. members." (*Id.*) Plaintiff quotes various phrases from several court opinions, wherein the federal district courts interchangeably referred to BASS as a "conservation group" or "conservation organization" and stated that "Bass Anglers Sportsman's Society of America, Inc., is a society composed of some 11,000 members whose purpose is the furtherance of conservation interest and programs connected with the overall use of waterways and navigation throughout the United States." (Pl.'s Ex.8.)

Plaintiff has also produced an assortment of BASS Master issues published after 1969. Plaintiff relies on a number of phrases wherein BASS Master states the magazine is published "exclusively for the membership of Bass Anglers Sportsman Society" and readers are told that the magazine is "the Society's BASSMASTER Magazine." (Pl.'s Facts at 3.) Plaintiff argues that through these statements, and others not herein mentioned by the court, "Defendants have continued to represent B.A.S.S. as a 'society' or 'association' whose purposes are those same founding purposes stated in the first issue of Bassmaster. Defendants' representations, throughout the years, have continued to reaffirm the original association contract for B.A.S.S." (Pl.'s 5th Am. Compl. ¶ 37.)

In response and in support of their own Motions for Summary Judgment, Defendants argue that BASS was never a not-for-profit association or an unincorporated association. Specifically, Defendants contend that BASS was not an unincorporated association because Defendant Scott paid taxes on all income from the business in 1968 and 1969 as his sole proprietorship. (Def. Scott's Resp. at 2.) Defendant Scott also went into debt and sold personal property in 1967 and 1968 in order to finance his efforts to build his business. (*Id.*) Defendants further argue that there were no articles of association, constitution, meetings of members, bylaws, charter, election of officers or board members, distribution or receipt of financial information, or any other document purporting to comprise a contract of association for the alleged unincorporated association. (Def. Jemison and Davis's Resp. at 6.) Furthermore, Defendant Scott argues that he told many people that he owned BASS even from the inception of the business. (Def. Scott's Resp. at 3.)

Defendants further contend that Plaintiff has failed to show the requisite intent,

**1274**

namely that the original members of BASS intended to join an unincorporated association and not Defendant Scott's own for-profit business. (BASS's Br. at 13.) Defendants also point to the testimony of six of the early BASS members, which they offer in support of their positions. (BASS's Facts at 2–3; Scott's Facts at 5–6.) These members all testified that they knew and believed at the time they joined BASS that it was Defendant Scott's for-profit business and that they did not acquire any voting rights or interest in BASS by becoming a member. (Butler Depo. at 24–28, Circle Depo. at 22–28, Sharp Depo. at 34–42, Holt Depo. at 32–36, Murski Depo. at 22–38, McDowell Depo at 21–51.) Defendants argue that Plaintiff has failed to offer any contrary evidence and, therefore, his Complaint is due to be dismissed. The court will now examine the merits of the Parties' arguments.

As a threshold matter, the court notes that it must first define the proper scope of the evidence submitted by the Parties. Although both sides have submitted voluminous evidence, primarily consisting of BASS Master issues that were published in the last thirty years, the court finds that the majority of this evidence is not relevant to the court's present determination. The initial question before this court is whether Plaintiff has met his burden and proven that BASS, prior to its incorporation in 1969, was created as an unincorporated association. If, as Plaintiff alleges, BASS was formed as an unincorporated association, then Defendant Scott could not lawfully have incorporated BASS without the consent of the other members. But if, on the other hand, BASS was Defendant Scott's for-profit business, then the opposite is true and he could have lawfully incorporate the entity.

Thus, the proper evidentiary scope for the determination of this initial issue includes only evidence related to the formation of BASS prior to its incorporation in 1969. Moreover, the court finds that for the most part, the post–1969 issues of BASS Master and the lawsuits allegedly filed by Defendant Scott in 1970's are not relevant to the present determination. Specifically, at the time the magazines were published and the lawsuits were filed, BASS had already acquired its legal status as either an unincorporated association or Defendant Scott's for-profit business. Thus, that evidence is not relevant to the present threshold inquiry and cannot be bootstrapped by the Parties.

■ The United States Supreme Court has defined an unincorporated association as "a body of persons united without a charter, but upon the methods and forms used by incorporated bodies for the prosecution of some enterprise." *Hecht v. Malley*, 265 U.S. 144, 157, 44 S.Ct. 462, 68 L.Ed. 949 (1924). Another definition specifies that an unincorporated association is "a body of persons acting together and using certain methods for prosecuting a special purpose or common enterprise." *Motta v. Samuel Weiser, Inc.*, 768 F.2d 481, 485 (1st Cir.1985) (citation omitted); *see also Penrod Drilling Co. v. Johnson*, 414 F.2d 1217, 1222 (5th Cir.1969)[16] (stating same definition).

■ Although an unincorporated association need not meet the formalities necessary to establish the corporate form, it "must have certain characteristics which justify its recognition as an entity or a distinct group of individuals." *Motta v. Samuel Weiser, Inc.*, 598 F.Supp. 941, 949 (D.Me.1984). Thus, an unincorporated association "does not come into existence or commence merely by virtue of the fortuitous creation of a community of interest or the fact that a number of individuals have

**16.** Decisions of the former Fifth Circuit rendered prior to October 1, 1981, constitute binding precedent in the Eleventh Circuit.

*See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981)(en banc).

simply acted together...." *Ermert v. Hartford Ins. Co.*, 559 So.2d 467, 474 (La. 1990). "The actual function of the group, not its formal title, determines the legal status of the group." *Four Way Plant Farm*, 894 F.Supp. at 1545 (citing *California Clippers*, 314 F.Supp. at 1068. "Associations that are not actual assemblages of people, but rather are 'amorphous and attenuated' groups or 'the most informal or transitory of organizations,' have been held not to constitute unincorporated associations." *Project Basic Tenants Union v. Rhode Island Housing & Mortgage Fin. Corp.*, 636 F.Supp. 1453, 1458 (D.R.I.1986) (citing *Motta*, 768 F.2d at 486; *California Clippers*, 314 F.Supp. at 1067)).

■ In *Lovell v. Brock*, 330 Ark. 206, 952 S.W.2d 161 (1997), the Supreme Court of Arkansas held that the owner of a hunting cabin and his paying guests did not constitute an unincorporated association. *Id.* at 213, 952 S.W.2d 161. In that case, Plaintiff, the administrator of the estate of a hunter who was fatally shot in a hunting accident, sued both a cabin owner and several hunters whom the owner allowed to use his cabin during deer season. *Id.* at 161. Each of these hunters paid the cabin owner $100 per season for use of the cabin. *Id.* Plaintiff alleged that said transaction converted the group into an unincorporated association and that its members were vicariously liable for said hunting accident. *Id.* at 162–63. In holding that said group failed to meet the requirements of an unincorporated association, the court relied on the following factors:

> [T]here were no such bylaws or efforts to incorporate or create any formal organization. The group staying at [the owner's] house had no membership requirements or elected officers. It was shown that [the owner] was the sole party with authority over the operation of the camp. The property was owned by [the owner] and the hunters abided by his terms without any written or

formalized agreement.... Each one was paying $100 a season for the privilege of sleeping and eating at the house, although no joint or communal arrangements had been made.... Neither did they have any apparent right of control or voting rights.

*Id.* at 164–65. Additionally, the *Lovell* court relied on a number of depositions submitted on behalf of the hunters. *Id.* at 165. Those depositions "indicate that the hunters thought that they were basically purchasing the right to occupy and eat in [the owner's] house. There is no indication that they thought they were purchasing a membership in an association that would entitle them to have future rights or interests in the property." *Id.* Therefore, the court held that "there was no showing of an intent, express or implied, to create a club or association." *Id.*

Likewise, in *Ermert*, the Supreme Court of Louisiana declared that a group of six hunters did not form an unincorporated association when they jointly leased a hunting camp. 559 So.2d at 469. Although the hunters each contributed money to cover the annual rental for the property, as well as divided the cost of groceries and other supplies equally, the court concluded that the hunters had never agreed or consented to form an unincorporated association. *Id.* at 474. In so concluding, the court relied on the testimony of one of the hunters, wherein he stated that "there really wasn't any such thing as a club. There was [sic] no officers. There was [sic] no president, no secretary.... It's a group of guys that go hunting, fishing, and go down and do a little bunch of cooking. or whatever." *Id.* Thus, the court declared that the hunters' actions of jointly hunting and using the camp were insufficient to form an unincorporated association, stating:

> [T]here must also be an agreement whereby two or more persons combine certain attributes to create a separate

entity for a legitimate purpose. While the parties need not specifically intend or have knowledge of all the legal ramifications of judicial personality, they must at least conceive of their creation as a being of thing separate from themselves.

*Id.* In sum, the court emphasized that the parties did not possess the requisite intent to create an unincorporated association and declared that "[s]ince the parties did not agree to create an association, no association existed...." *Id.* The court also noted that the "hunters never drew up a contract, constitution, by-laws, or any written instrument." *Id.* at 474.

First, the court finds that in the present case, as in both *Lovell* and *Ermert*, Plaintiff has failed to offer any proof that the early members of BASS agreed to create an unincorporated association. Although Plaintiff alleges that at the time Defendant Scott incorporated BASS in 1969 there were over 4,000 members nationwide, Plaintiff has failed to offer a single affidavit or deposition taken from any of these early members that supplies the requisite information or indicates such an agreement. (Pl.'s 5th Am. Compl. ¶ 53.)

Defendants, on the other hand, offer affidavits and deposition testimony taken from six of the original members of BASS, wherein the members state assertions that are directly contrary to Plaintiff's position. Specifically, these members state that, at the time they joined BASS, they did not intend to create an unincorporated association and they knew that BASS was Defendant Scott's for-profit business. For instance, at Circle's deposition, when he was asked to describe the type of entity BASS was when he joined, he stated:

Q. Between the time you first met Ray Scott in 1967 and up through the time that you joined B.A.S.S. and became a life member, did you understand that this was the way that Ray desired to earn his livelihood?

A. There wasn't the slightest doubt in my mind from the first time I listened to the plan what he had in mind for this organization. And then in subsequent meetings down the years when we got together for tournaments and so on that this was a business he was operating, the same as his insurance business, which he sold to go into the business to make a living out of it.

(Circle's Dep. at 22–23.) Likewise, Butler, the first official member of BASS, responded as follows:

Q. When you agreed to become B.A.S.S.'s first life member you did not agree with Mr. Scott to create a charitable organization, did you?

A. No.

Q. And do you know whether Mr. Scott intended to create a charitable organization?

A. I know he did not.

(Butler's Dep. at 23–24.)

Based on the evidence submitted by the Parties, the court finds that Plaintiff has failed to offer any proof regarding an agreement to create an unincorporated association between the early members of BASS. The court further finds said failure to be determinative in the present case because "individuals who form an unincorporated association certainly should know what sort of an organization it is, how it happened to be formed, who influenced its formation, and who controls it." *Donnelly Garment Co. v. National Labor Relations Bd.*, 123 F.2d 215 (8th Cir.1941). The uncontroverted evidence before the court is that these early members believed that BASS was Defendant Scott's personal business and did not believe that they were "a body of persons acting together...for prosecuting a special purpose." *Penrod*, 414 F.2d at 1222.

Moreover, the court finds that Plaintiff failed to provide any documentary evi-

dence to support a finding that the early members of BASS made an agreement to associate. Such a consideration is consistent with both *Lovell* and *Ermert*, wherein the courts relied on the fact that there was no written document, meaning no bylaws, constitution, or articles of association, evidencing the early members' agreement to create such an unincorporated association.[17] Similarly, in *California Clippers*, the court, in determining that the group at issue was not an unincorporated association, noted that the group had no charter, no bylaws, no articles, no bank account or office, no place of business, no mailing address, no assets, and no obligations. *See California Clippers*, 314 F.Supp. at 1068. The district court concluded, "we are convinced that the International Games Committee is just what it purports to be, a committee and not an unincorporated association." *Id.* at 1068.

Likewise, in *Motta*, the First Circuit concluded that the purported leader of a mystic cult failed to prove that the cult was an unincorporated association because "there was no evidence of any standards identifying the membership in [the cult] or of successorship to be the [leader of the cult]." *Motta*, 768 F.2d at 486. In so holding, the Second Circuit quoted a former opinion of the Maine Supreme Judicial Court, wherein it stated that the association was "too amorphous in light of the fact that membership was uncertain, could not be ascertained with any reasonable degree of accuracy, and there was no by-law which regulated or defined the criteria for membership eligibility." *Id.* (citing *Johnson v. South Blue Hill Cemetery Ass'n*, 221 A.2d 280, 283 (Me.1966)). *See also Yonce v. Miners Memorial Hosp. Ass'n*, 161 F.Supp. 178, 185 (W.D.Va.1958) (finding that a board of trustees of a fund

---

**17.** The court notes that in Plaintiff's Brief filed in support of his Motion for Summary Judgment, only four pages of his twenty page brief addresses the issue of whether BASS is an unincorporated association. Rather, Plaintiff summarily concludes that "[t]he substantive law regarding associations... is older than the Republic itself, tracing its origin back to and before English common law." (Pl.'s Br. at 7.) Plaintiff then cites four cases, all four of which deal with property rights afforded by members of an association and are inapplicable to the threshold issue before the court.

Plaintiff appears to rest his entire argument that BASS is an unincorporated association on the following basic principle. At this court's hearing on the Motions for Summary Judgment, Plaintiff made the following argument:

The only requirements to have an association under the law of this country is [sic] to have a group of individuals come together for some common purpose and goal.... [Y]ou don't even have to have a written document to have an unincorporated association. You don't have to have any degree of formal structure. You don't even have to have officers, you don't have to have meetings, you don't have to have rules and regulations, so long as you have the necessary requirements of a group of people interested in a common objective or purpose.

(Tr. of August 13, 1998 Hearing at 15–16.) Only in Plaintiff's Response to Defendant Scott's Motion for Summary Judgment does he provide the court with case law supporting his position. In said Response, Plaintiff cites, inter alia, *Burckhardt v. Chambers*, 160 Wash. 256, 294 P. 977 (1931), for the proposition that "members of association had property rights even if there was nothing more than an agreement to associate; rights existed even without formal structure, by-laws or rules." (Pl.'s Resp. at 8.)

In this opinion, the court by no means wishes to imply that some type of formal structure or by-laws is necessary to the formation of an unincorporated association. Rather, the focus of this opinion lies on whether Plaintiff has proven that there was an agreement, as indicated by Plaintiff's reference to *Buchkardt*, between said members to form an unincorporated association. Although the court, in this opinion, has examined whether the "members" executed any kind of written document, the court only considered this evidence as proof that an agreement existed between the members. However, the court has not found that such a document must exist as an absolute requirement. Had Plaintiff presented the court with evidence that such an agreement existed, the court likely would have disregarded the absence of such a document.

was not an unincorporated association because they were "not permitted...to prescribe the conditions or qualifications of their membership or their duties, to enlarge or reduce their membership, to enlarge or decrease the scope of their activities, to dissolve the association, or to do many of the other things that they would be permitted to do if the three trustees were an association"); *Compare Project Basic Tenants Union*, 636 F.Supp. at 1458 (finding that the union constituted an unincorporated association because its members met regularly, leased office space, employed a full-time staff person, and "has funding and presumably does business on its own behalf").

In the present case, this court, like those discussed above, finds that Plaintiff has failed to present any written document purporting to constitute the aforementioned contract of association, bylaws, or other rules governing the membership of Plaintiff's purported unincorporated association. Plaintiff, in an attempt to compensate for this deficiency, argues that the purposes published in the first issue of BASS Master constitute a contract of association. However, the court is unpersuaded by Plaintiff's argument for the following reasons. First, although it is true that the first issue of BASS Master contained noble conservation goals, this issue was not sold to the public. Instead, this issue was mailed only to those individuals who had previously joined BASS and had paid their membership fees. Thus, these purposes did not entice new members to join BASS; they were published only for the benefit of those members who had previously joined. Additionally, as previously discussed, there is no evidence before the court that these purposes, or that any of Defendant Scott's other statements made in the process of member solicitation, caused any of the early members to believe anything other than the fact that BASS was Defendant Scott's own personal business.

Moreover, the purposes published in BASS Master do not regulate the rules governing membership of BASS, i.e., the expulsion or discipline of members. Furthermore, there is no evidence that BASS's members have ever held a meeting or functioned as a group in any other way. *See Four Way Plant Farm*, 894 F.Supp. at 1545 (stating that "[t]he actual function of the group, not its formal title, determines the legal status of the group").

Thus, the only factual allegations that remain to support Plaintiff's claim are a few references in the Summer, Fall, and Winter 1968 issues of BASS Master to BASS as a "society," references that BASS Master is "your magazine," and various references extracted from three letters[18] mailed by Defendant Scott prior to 1969.

---

**18.** The first two letters were dated November 29, 1967 and were written by Defendant Scott to New York businesses in an attempt to solicit mailing lists. (Pl.'s Ex. 115.) One of the letters stated as follows:

> My business for the past twelve months has been the creation and promotion of the National Invitational Bass Tournaments.... My entry fee was $100 and I attracted 106 outstanding bass anglers from thirteen states.... The success of these tournaments have [sic] kindled my interest and dedication. They have not been outstanding money makers but I honestly believe there is potential for an honorable profit.:... I am in the process of forming a national bass fishermen's association. A forum of this association will be my tourna-

ments and my solicitation of memberships will be conducted on a controlled direct mail process.

(Pl.'s Ex. 116.) The third letter, dated February 15, 1968, was written by Defendant Scott *as an attempt to solicit a new member of BASS.* The third letter stated, in pertinent part, as follows:

> You are cordially invited to join this outstanding new organization. BASS is for you, the bass fisherman. BASS ain't [sic] for those fellows who spend most of their time tangling with tarpon or messing with musky. Bass fishermen are a unique breed, and deserve their own organization.

(Pl.'s Ex. 117.)

To the extent that these letters refer to BASS as an "organization," the court finds such language to be insufficient to establish

The court finds that these allegations, standing alone as they do, are insufficient to support a finding that BASS is an unincorporated association. First, the fact that the name employed to refer to BASS includes within it the word society neither confers legal meaning upon BASS nor automatically converts said entity into an unincorporated association. *See Four Way Plant Farm,* 894 F.Supp. at 1545 (citing *California Clippers,* 314 F.Supp. at 1068 (stating that it is "[t]he actual function of the group, not its formal title, determines the legal status of the group")); *see also Testa v. Janssen,* 482 F.Supp. 1195, 1200 (W.D.Pa.1980) (refusing to extend the definition of unincorporated association to a business entity that employed the word "organization" in its name).

Additionally, Plaintiff apparently wishes the court to infer that because Defendants referred to BASS Master was "your magazine" that all BASS members therefore owned said magazine. However, the court concludes that Defendants were merely clarifying that BASS Master was designed exclusively for those individuals interested in the sport of bass fishing. Indeed, one of the listed purposes in BASS Masters was "[t]o stimulate public awareness of Bass fishing as a major participation sport. To elevate our sport to a place of prominence with golf, bowling, boat racing and billiards." (Pl.'s Ex. 22.)

Furthermore, by referring to BASS Master as "your magazine," Defendants were also clarifying that a subscription to BASS Master was one of the benefits of BASS membership and was not sold to the general public. In a magazine section entitled "BASS BENEFITS," the section clarified that "[e]ach member receives a yearly subscription to THE BASSMASTER MAGAZINEthe dream of every bass fisherman" together with "a beautiful silk embroidered official Bass member's patch." (Pl.'s Ex. 22.) Moreover, to the extent that Defendant Scott also refers to himself as "Your Editor," the court finds that such title does not preclude him from serving a dual role as Editor and Owner. Therefore, the court concludes that the language cited by Plaintiff is insufficient as a matter of law to support a conclusion that BASS is an unincorporated association.

Based on the foregoing, the court finds that Plaintiff has failed to produce sufficient evidence that BASS, as organized in 1967, constitutes an unincorporated association. Specifically, the court finds that, due to the absence of any writing, any testimony pertaining to an oral agreement, and/or any conduct evidencing a belief that the early members of BASS were forming an unincorporated association, summary judgment is due to be granted in favor of Defendants and that Plaintiff's Complaint is due to be dismissed.[19] Indeed, all of the evidence before the court supports Defendants' assertions that BASS was Defen-

---

that BASS is an unincorporated association. *See* discussion *infra.*

With regard to Defendant Scott's first two letters, the court finds that Defendant Scott clearly indicated to the reader that he was organizing BASS for profit. Specifically, Defendant Scott referred to the tournaments as "my business," and discussed "my entry fee" with regard to said tournaments. Further, Defendant Scott stated his intention to make profit by stating that although the tournaments "have not been outstanding money makers but I honestly believe there is potential for an honorable profit." Thus, the court finds that these letters also fail to lend support to Plaintiff's claim that BASS is an unincorporated association.

**19.** The court notes that, had the Plaintiff alternatively pleaded his Complaint, the court could conceivably have reached a different result. In his Fifth Amended Complaint, Plaintiff bases all three of his counts, and his prayers for relief, on the premise that BASS was formed as an unincorporated association. Plaintiff has not pleaded in the alternative, meaning that Plaintiff has not alleged that even if the court finds that BASS is not an unincorporated association, Defendants still committed fraud by misrepresenting to members that BASS was an unincorporated association when they knew that it was, in fact, Defendant Scott's own for-profit business. Rather, Plaintiff has predicated his entire Complaint on the allegation that BASS is an

dant Scott's personal, for-profit business for which he assumed all debts and liabilities and could, therefore, lawfully incorporate in 1969.

## C. *Defendant Scott's Counterclaims*

Because the court has found that Plaintiff's Complaint is due to be dismissed, the court also finds that a portion of Defendant Scott's Counterclaims is due to be dismissed. On November 14, 1997, Defendant Scott filed a combined Answer and Counterclaims ("Countercl."), wherein he brought suit against Plaintiff Bradley Murray both individually and as a representative of the class he purports to represent. (Countercl. at 39.) Defendant Scott stated that his "claim [sic] against [Plaintiff] in his representative capacity are alternative claims in that such claim [sic] assumes (a) the validity of [Plaintiff's] legal theories and (b) [Plaintiff's] representative status, both of which are at issue." (*Id.* at 40.) Because the court has dismissed Plaintiff's Complaint and because Defendant Scott has predicated the viability of his claims on the success of Plaintiff's claims, the court finds that Defendant Scott's claims against Plaintiff in his representative capacity are due to be dismissed.

Additionally, the court notes that Defendant Scott has pleaded claims against a number of fictitious Parties. The court finds that said claims are due to be dismissed, there being no provision for fictitious party practice under federal law. *See New v. Sports & Recreation, Inc.,* 114 F.3d 1092, 1094 n. 1 (11th Cir.1997); *see also* Fed.R.Civ.P. 10.

Thus, the only claims remaining in Defendant Scott's Counterclaim are those allegations against Plaintiff in his individual capacity. Because the court is uncertain as to Defendant Scott's desire to proceed with those claims now that the court is dismissing Plaintiff's Complaint, the court will refrain from dismissing said claims at this time. However, Defendant Scott is instructed that, within ten (10) days from the date of this Order, he must either file an Amended Counterclaim, wherein he deletes those claims herein dismissed by the court, or file a Motion for Voluntary Dismissal of his claims remaining against Plaintiff.[20] Should Defendant Scott elect to file an Amended Counterclaim in lieu of a Motion for Voluntary Dismissal, the court will entertain a Renewed Motion to Dismiss said claims, to be filed by Plaintiff, if so desired, within two weeks of the filing of Defendant Scott's Amended Counterclaim.

## ORDER

Based on the foregoing, it is CONSIDERED and ORDERED as follows:

1. That Plaintiff's Motion for Summary Judgment be and the same is hereby DENIED;

2. That Defendants' Motions for Summary Judgment be and the same are hereby GRANTED and that Plaintiff's Complaint be and the same is hereby DISMISSED WITH PREJUDICE;

3. That Defendant Scott's Counterclaim be and the same is hereby DISMISSED in part as follows:

unincorporated association, and because the court disagrees, Plaintiff's entire Complaint is due to be dismissed. However, had Plaintiff adopted a different strategy and argued that Defendants, knowing that BASS was a for-profit entity, knowingly made misrepresentations that BASS was a non-profit entity, the later issues of BASS Master and other post–1969 evidence would likely have been entirely relevant to the court's examination of such a

claim, which could have impacted on the court's ultimate determination. This is not to suggest, however, that the court would have so decided.

**20.** Pursuant to Fed.R.Civ.P. 41(a)(2), the court would dismiss Defendant Scott's claims without prejudice.

a. That all claims against Plaintiff in his representative capacity be and the same are hereby DISMISSED WITH PREJUDICE; and

b. That claims against fictitious Parties be and the same are hereby DISMISSED WITH PREJUDICE;

4. That Defendant Scott be and the same is hereby DIRECTED to inform the court within ten (10) days of the date of this Order whether he wishes to proceed with his claims against Plaintiff in his individual capacity;

5. That all Motions not expressly decided by the court be and the same are hereby DENIED AS MOOT; and

6. That all costs herein incurred be and the same are hereby assessed against Plaintiff for which let execution issue.